## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DIANE BURKE and BLAKE PARRA, as participants in and on behalf of the Boeing Voluntary Investment Plan, and on behalf of a class of all others who are similarly situated, | : : : : : | Civil Action No.: |
| *Plaintiffs*, | : : | CLASS ACTION COMPLAINT |
| v. | : : | **JURY TRIAL DEMANDED** |
| THE BOEING COMPANY, DAVID A. DOHNALEK, J. MICHAEL LUTTIG, THE BOEING EMPLOYEE BENEFIT PLANS COMMITTEE, THE BOEING EMPLOYEE BENEFIT INVESTMENT COMMITTEE, AND JOHN DOES 1-25 | : : : : : : | |
| *Defendants.* | : : | |

Plaintiffs Diane Burke and Blake Parra ("Plaintiffs"), participants in the Boeing Voluntary Investment Plan (the "Plan"), bring this action in a representative capacity on behalf of the Plan, and as a class action on behalf of all other similarly situated participants in and beneficiaries of defined contribution plans (the "Plans") sponsored by Defendant the Boeing Company ("Boeing") against Boeing, David A. Dohnalek, J. Michael Luttig, the Employee Benefit Plans Committee ("EBPC" or the "Plans Committee"), the Employee Benefit Investment Committee (the "EBIC" or the "Investment Committee," together with the EBPC the "Committees"), and John Does 1-25, who were certain members of the Committees (the "Committee Members," and together with Dohnalek and Luttig, the "Individual Defendants"). Plaintiffs bring this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3). By this action, Plaintiffs seek relief for the Plan for Defendants' breaches of their ERISA fiduciary duties as set forth herein.

1.    The Individual Defendants are among the Plans' named fiduciaries pursuant to ERISA § 402(a), or were *de facto* fiduciaries pursuant to ERISA § 3(21)(a). As ERISA fiduciaries, Defendants owe strict fiduciary duties of loyalty and prudence to the Plans and the participants in and beneficiaries of the Plans. ERISA § 404(a), 29 U.S.C. § 1104(a). ERISA's fiduciary duties are "the highest known to the law." *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011).

2.    The Plans are designed to help Boeing's employees save for retirement. The Plans are defined contribution retirement plans. Defined contribution plans "provide[] for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

3.    Thus, and unlike traditional defined benefit pensions, in defined contribution plans like the Plans, participants at retirement are entitled to no more than the balance in their individual accounts. As the Supreme Court explained in 2015, in defined contribution plans employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

4.    At all relevant times, the Plans included as an investment option the VIP Stock Fund designed to invest in shares of stock of Boeing, the Plans' sponsor and the employer of the participants in the Plans. Plaintiffs invested in the VIP Stock Fund through their accounts in the Plan during the Class Period.

5.    However, for many years Boeing's stock price has been artificially inflated. The 737 model commercial jet has been Boeing's bestselling aircraft for decades, and the recently

developed Boeing 737 MAX series are the core of Boeing's growth plans.

6.     Boeing had a problem going back to at least 2010.  One of the biggest factors in airline operation expense is the cost of fuel.  Technological advances in jet propulsion resulted in the development of more fuel-efficient engines.  But those new engines were larger in diameter than the older less efficient engines; the engines that were installed on Boeing's original 737 series of airplanes.  More importantly, the overall design of the 737 airframe, particularly the distance between the wing and the ground, was lower than the airframes of Boeing's biggest competitors.  As a result, the newer more fuel-efficient jet engines could not be easily installed on the 737.  However, Boeing decided that the cost of developing an entirely new plane designed to accommodate the newer larger engines would be staggering.  So Boeing engineers figured out a way to install the new engines on the old airframe.  In August 2011, Boeing announced that it had lined up orders for 496 Boeing 737 aircraft retro-fitted with new engines from five different airlines.

7.     But the new engines had to be mounted higher and more forward than did the original engines, which materially changed the balance and accordingly, the flight characteristics of the plane.  As a result, the flight control systems had to be changed in order to manage the altered flight characteristics.  Because the engines were moved forward, the plane would tend to be more nose heavy, so the flight control systems had to be modified to keep the nose up and maintain proper aerodynamics.  This meant increasing the plane's "angle of attack."  The angle of attack is the angle of the wing relative to the plane's vector, or direction of travel.  When a plane is flying straight and level the angle of attack might be zero or close to zero.  When a plane is ascending, the angle of attack will be higher.  If the angle of attack is too high relative to the speed of the plane, it can cause a disruption of the airflow over the wing, and a complete loss of lift,

resulting in a "stall." When a stall occurs, the plane literally starts falling from the sky. The remedy to prevent a stall from occurring is to lower the nose of the aircraft, reducing the angle of attack and re-establishing consistent airflow over the wing.[1]

8.     Planes have sensors in the wings to warn of an impending stall, and commercial planes have systems that will automatically lower the nose in order to prevent a stall. The systems installed in the 737 MAX designed to offset the imbalance resulting from the placement of the new engines had problems on takeoff, the time during which the angle of attack is the greatest. Sensors indicated danger of a stall and forced the nose of the plane down.

9.     The problem was noticed by pilots. According to a Dallas Morning News review of voluntary aircraft incident reports to a NASA database:

> The disclosures found by the News reference problems with an autopilot system, and they all occurred during the ascent after takeoff. Many mentioned the plane suddenly nosing down. While records show these flights occurred in October and November, the airlines the pilots were flying for is redacted from the database.[2]

10.     Boeing was aware enough of the problem to have created a warning light system if there was problem with the angle-of-attack sensors on the 737 MAX. But rather than make that warning light system standard equipment on the plane, it was an $80,000 optional add-on.[3]

---

[1] *See, generally,* Mathew Yglesias "The emerging 737 MAX scandal, explained" Vox, March 29, 2019, available at https://www.vox.com/business-and-finance/2019/3/29/18281270/737-max-faa-scandal-explained (last viewed March 29, 2019).

[2] "Several Boeing 737 Max 8 pilots in U.S. complained about suspected safety flaw" Dallas News, March 12, 2019, available at https://www.dallasnews.com/business/airlines/2019/03/12/boeing-737-max-8-pilots-complained-feds-months-suspected-safety-flaw?utm_content=bufferffc95&utm_medium=social&utm_source=twitter.com&utm_campaign=buffer (last viewed March 29, 2019).

[3] "Boeing to make standard an $80,000 warning light that was not on doomed planes," CBS Morning News, available at https://www.cbsnews.com/news/boeing-737-max-plane-crash-company-to-make-standard-light-warning-pilots-of-sensor-malfunction/ (last viewed March 29, 2019).

11.     Defendants knew or should have known that this represented a major engineering and manufacturing issue that was sure to have a significant impact on Boeing's future operations as it would have been well-known and highly discussed within upper echelons of Boeing management.  Boeing's senior management received numerous reports on the progress and testing of the necessary engineering solutions.  The reported problems with flight controls would have been widely discussed among senior Boeing executives, and the decision to make the warning light system an optional add-on, were analyzed, reviewed and discussed among Boeing executives well beyond the engineering divisions, and included finance, sales and marketing.  Boeing's senior management, including the members of the Executive Council and the Individual Defendants, knew or should have known about all of the serious safety problems and proposed work-arounds throughout the Class Period.

12.     Boeing, and the Individual Defendants, thus knew for many years that the 737 MAX faced crucial safety problems. Indeed, Boeing knew or should have known that eventually the truth about the safety problems with its 737 MAX aircraft would become publicly known, and would lead to massive disruptions in the demand for the 737 MAX, a large downward correction in the value of Boeing's stock, and significant reputational harm. In October of 2018, these safety problems in the 737 MAX tragically manifested themselves in the crash of a 737 MAX in Indonesia. By that time, it was or should have been clear to all of Boeing's senior management, including the Individual Defendants, that public disclosure of the significant safety problems with the 737 MAX was inevitable. Yet Boeing did not disclose these problems publicly. Boeing's failure to disclose the serious safety problems with its 737 MAX aircraft left the public unaware of these issues, and led to inflation of Boeing's stock price.

13.     In the wake of the second crash, Boeing's operations have suffered significant

setbacks. Almost every country in the world has grounded 737 MAX aircraft, and new deliveries have been put on hold. The market has reacted to this news accordingly, and Boeing's share price plunged more than $65 per share, from $442.54 on Friday, March 8, 2019 to $375.41 on Tuesday, March 12, 2019 in the wake of the second crash, as the public became aware that Boeing had concealed these serious safety issues.

14.     The Individual Defendants, who serve as the Plans' fiduciaries, include senior executives of Boeing. Mr. Luttig, for example, is the company's Executive Vice President and General Counsel and a member of the company's Executive Council. Mr. Dohnalek is Boeing's Senior Vice President of Finance and its Corporate Treasurer.

15.     Defendants knew that Boeing's stock price was artificially inflated in value, and knew that many of the Plans' participants, including Plaintiffs, allocated significant portions of their retirement savings to Boeing stock and made additional purchases of Boeing stock for their retirement savings accounts in the Plans on an ongoing basis.

16.     Defendants failed to take any action to protect the Plans and their participants. In particular, Defendants failed to disclose the truth about the safety problems with the 737 MAX publicly, even as it became inevitable that the public would learn about these safety problems Defendants stayed quiet as the Plans' participants, including Plaintiffs, continued to purchase and hold Boeing stock at the inflated price in their retirement savings accounts.

17.     Boeing's reputation has been seriously damaged by its concealment of the safety problems with the 737 MAX, and that reputational harm has been felt by Boeing's shareholders, including Plaintiffs and the other Plan participants who included Boeing shares in their retirement savings.

6

## JURISDICTION AND VENUE

18.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (3).

19.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

20.     This Court has general personal jurisdiction over Defendant Boeing, which is incorporated in this District, and over any other defendants that reside in this District. This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this District through the management of the Plan.

21.     Pursuant to 29 U.S.C. § 1132(e)(2) venue is proper in this District because the breaches described herein occurred in this District. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

22.     The Plan is an employee benefit plan and employee pension benefit plan covered by ERISA within the meaning of ERISA § 3(2)(A) & (7), 29 U.S.C. § 1002(2)(A) & (7).

23.     Plaintiff Diane Burke is an individual residing in Tacoma, Washington, and at all relevant times has been a participant in the Plan. Plaintiff Burke purchased and owned units of the Boeing stock fund through her account in the Plan during the Class Period.

24.     Plaintiff Blake Parra is an individual residing in Seattle, Washington, and at all relevant times has been a participant in the Plan. Plaintiff Parra purchased and owned units of the Boeing stock fund through his account in the Plan during the Class Period.

25.     Defendant Boeing, together with its subsidiaries, is an American multinational corporation that designs, manufactures, and sells airplanes, rotorcraft, rockets, satellites, and missiles worldwide. According to its own website, "Boeing is the world's largest aerospace company and leading manufacturer of commercial jetliners, defense, space and security systems, and service provider of aftermarket support. As America's biggest manufacturing exporter, the company supports airlines and U.S. and allied government customers in more than 150 countries."[4] Boeing is incorporated in Delaware and is headquartered in Chicago, Illinois. Boeing's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BA".

26.     Defendant Employee Benefit Plans Committee is the Plan Administrator pursuant to ERISA § 3(16). The Committee is comprised of Boeing officers and employees.

27.     Defendant Employee Benefit Investment Committee is a fiduciary of the Plan and all of the assets of all Boeing employee benefit plans. The Boeing Board of Directors has appointed the EBIC as a Plan fiduciary. The Boeing Board of Directors has delegated to the EBIC authority to invest, reinvest and manage assets of all Boeing employee benefit plans and to select and monitor the investment options for the Plan. The Boeing Board of Directors has authorized the EBIC to select, hire, retain, appoint, replace and/or terminate plan trustees, investment managers, mutual funds, vendors, and advisers.

28.     Many of the Committee Members are among the most senior executives at Boeing and serve as members of Boeing's Executive Council.

29.     The Individual Defendants are all members of the Committees, and all had knowledge of the truth about the problems with the Boeing 737 MAX series and had authority to

---

[4] *See* https://www.boeing.com/company/.

make disclosures on behalf of Boeing to the SEC.

Each of the Individual Defendants:

- Was, as a Committee Member, directly responsible for the management of the Plan;

- Was directly involved in the day-to-day operations of Boeing at the highest levels;

- Was privy to confidential proprietary information concerning Boeing and its business and operations;

- Owed a fiduciary duty to the Plan; and

- Failed to take any steps to ensure that the truth about the safety of the 737 MAX was disclosed to the public.

## FACTUAL ALLEGATIONS

30.     The 737 series are narrow bodied, twin engine passenger airliners with a short to medium range. The 737 has been continuously manufactured since 1967, and the first 737 entered service with Lufthansa in 1968. Boeing has manufactured and delivered more than 10,000 aircraft in the 737 series.

31.     Boeing launched the 737 MAX series on August 30, 2011. The 737 MAX is an upgraded version of the earlier 737s, and is designed to deliver improved fuel efficiency and lower operating costs. Boeing specifically intended the 737 MAX for the rapidly growing Asian market, in particular, China. Boeing has predicted it will soon become the world's first trillion-dollar market for jets. Boeing estimates that China will need 7,690 commercial jets by 2037. As of 2019, Chinese airlines have ordered 180 of the 737 MAX aircraft, of which 76 have been delivered.

32.      The 737 MAX performed its first flight in January of 2016, and gained FAA certification on March 8, 2017. The first delivery of a 737 MAX was to Malindo Air, a Malaysian

airline, on May 6, 2017. By mid-2018, Boeing was producing 52 of the 737 MAX aircraft each month.

**A. The First Crash**

33.     On October 29, 2018, Lion Air Flight 610 (the "Indonesian Flight") was a scheduled domestic flight operated by the Indonesian airline Lion Air from Soekamo-Hatta International Airport in Jakarta, Indonesia to Depati Amir Airport in Pangkal Pinang, Indonesia. Minutes after takeoff, the Boeing 737 MAX 8 (the "Lion Air Jet") operating the route crashed into the Java Sea, killing all 189 passengers and crew (the "First Crash").

34.     According to Indonesian safety regulators, the Lion Air Jet that crashed into the Java Sea was unfit to fly on more than one occasion in the days leading up to its final flight.[5] This revelation came in an Aircraft Accident Investigation Report, dated October 29, 2018 (the "Indonesian Investigation Report").

35.     The Indonesian Investigation Report focuses in on Lion Air's maintenance practices as well as its anti-stall systems in the aircraft. As the Indonesian Investigation Report notes, the Lion Air Jet's maintenance logs reported problems with airspeed and altitude readings on four of the six flights operating during the three days prior to the crash. In fact, the problems were serious enough that on the Lion Air Jet's second-to-last flight, from Bali to Jakarta (the "Bali-Jakarta Flight"), the crew reported a "stick shaker activation", which warns of a stall.

36.     The Indonesian Investigation Report stated that this "condition is considered as an un-airworthy condition and the flight shall not be continued." Furthermore, the troubles on the

---

[5] *See* Barbara S. Peterson, If the Lion Air Jet Was "Unairworthy," Then Why Was It Allowed To Fly?, Popular Mechanics (November 29, 2018),
https://www.popularmechanics.com/flight/airlines/a25349919/lion-air-610-jet-not-airworthy/.

Bali-Jakarta flight came one day after one of the angle-of-attack sensors was replaced on the Lion Air Jet, again, after the crew reported similar serious safety issues.

37.     John Goglia, a safety consultant and former member of the National Transportation Board, stated that "[f]or three days, this plane was flying around when they knew there were problems." He also stated that he has "grounded planes with much less serious conditions."

**B. The Second Crash**

38.     On March 10, 2019, the Ethiopian Flight was a scheduled international passenger flight from Addis Ababa Bole International Airport in Ethiopia to Jomo Kenyatta International Airport in Nairobi, Kenya. Minutes after takeoff, the 737 MAX operated by Ethiopian Airlines crashed (the "Second Crash").

39.     In the weeks after the First Crash, Boeing defended the plane's safety features and publicly resisted calls to make changes to its system and pilot training procedures.[6] However, following the Second Crash, a worldwide grounding of the planes by regulators, a stock slide, and the loss of a multibillion-dollar contract, Boeing is taking a new approach.[7] The company invited hundreds of pilots and airline partners to its Renton, Washington assembly facility on March 27, 2019, in a hastily arranged meeting in order to explain new safety enhancements.[8] Boeing has still

---

[6] *See* Douglas MacMillan and Aaron Gregg, Boeing, initially defensive, now 'humbled' by 737 crisis, The Washington Post (March 27, 2019), https://www.washingtonpost.com/business/2019/03/27/boeing-initially-defensive-now-humbled-by-max-crisis/?utm_term=.62d46e19c9d7.
[7] *Id.*
[8] *Id.*

continued to defend the safety of its planes and deflect claims that its automation software may have contributed to the First Crash or Second Crash.[9]

## C. Reputational Damage to Boeing Continued to Increase Through the Class Period

40.     Defendants' failure to promptly disclose that its stock price was artificially inflated harmed Boeing's long-term prospects as an investment and undermined the creditability of those managing the company.

41.     Economic analysis further shows that "reputational harm is a common result of fraud and grows the longer the fraud is concealed, translating to larger stock drops." *Jander v. Retirement Plans Committee of IBM*, 910 F.3d 620, 629 (2nd Cir. 2018).  Plaintiffs need not allege fraud for their ERISA claims, however, but only that Defendants had knowledge of the overvaluation of the Boeing stock and failed to disclose that information, as alleged herein. *Id.* at 632.

## D. Boeing Stock was Traded in an Efficient Market

42.     Because Boeing stocks were traded in an efficient market, Defendants could not have reasonably believed that the disclosure that its 737 MAX were unsuitable for flight would have harmed Boeing stock prices more than the correction of the price after the disclosure. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (stating "the market price of shares traded on well-developed markets reflects all publicly available information."). Defendants could not have believed this because it would be contrary to most basic economic principles regarding efficient markets. Nor did Defendants have any reason to believe that any factors were distorting the market which would have affected Boeing's stock price any more than a correction for the inflated price.

---

[9] *See Id.*

**E. Eventual Disclosure was Inevitable because of Boeing's Duty to Disclose the Problems with its 737 MAX**

43.    By no later than October 29, 2018, when the First Crash occurred, it was inevitable that the truth about Boeing's 737 MAX would become known to the public.

44.    Nevertheless, Boeing has still failed to disclose the truth.

45.    Despite their knowledge of Boeing's false representations, the inflation of Boeing's stock price, and the inevitability of the disclosure of the truth, Defendants have taken no action to disclose the truth to the public. Instead, Defendants have stayed quiet as the Plan's participants, including Plaintiffs, continue to purchase and hold Boeing's stock at the inflated price.

46.    Making a corrective disclosure once it became inevitable that the public would learn about the safety issues with the 737 MAX was an alternative action that the Defendants could have taken that would have been entirely consistent with the securities laws and which no prudent fiduciary could have viewed as more likely to harm the Plan than to help it.

47.    Nor are the corrective disclosures at issue here merely a matter of hindsight. It would have been obvious to any prudent and loyal fiduciary no later than October of 2018 that corrective disclosure would have benefitted the Plans. As the Second Circuit has explained, "[a] reasonable business executive could plausibly foresee that the inevitable disclosure of longstanding corporate fraud would reflect badly on the company and undermine faith in its future pronouncements." *Jander*, 910 F.3d at 629.

48.    Many economists and financial analysts have concluded that corporate fraud has significant reputational consequences that translate into concrete economic harm. For example, reputational penalties have been found to include "a loss of sales by a firm that engages in consumer fraud... and increases in the rate of return required by investors when a firm issues vague

or misleading financial statements."[10] Moreover, studies have shown "a significant negative average abnormal stock price reaction (loss in firm value) when allegations of corporate misconduct are announced."[11] Indeed, the longer the fraudulent corporate conduct lasts, the greater the reputational harm will likely be.

49.     In Boeing's case, the reputational harm from the concealment of the safety issues with the 737 MAX has been real and dramatic. For example, Bloomberg reported that "Boeing also had a responsibility to err on the side of safety and an opportunity to control the story by advocating conservatism earlier. It chose not to, and it will have to wrestle with the reputational damage wrought by that decision."[12] In an article entitled "Boeing: An Unmitigated Reputational Damage," Marketscreener.com summarized that "Since the unfortunate incidence, the company has been more focused on managing its reputation which has sunk lower every day and continues to damage its brand equity. There are strong doubts on whether Boeing will regain its stellar reputation in the aviation sector."[13]

50.     Defendants knew of the overvaluation of Boeing stock during the Class Period but failed to disclose the overvaluation publicly, thereby injuring Plan participants who purchased units of the Boeing stock fund through their Plan accounts during the Class Period.

---

[10] Deborah L. Murphy, Ronald E. Shrieves & Samuel L. Tibbs, Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk, Journal of Financial and Quantitative Analysis, Vol. 44, No. 1 (Feb. 2009).

[11] Id. See also Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, The Cost to Firms of Cooking the Books, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008).

[12] Sutherland, Boeing and the FAA Already Lost Control of the Narrative (March 13, 2019), available at https://www.bloomberg.com/opinion/articles/2019-03-13/boeing-and-the-faa-737-max-grounding-damage-is-already

[13] Boeing : An Unmitigated Reputational Damage, Marketscreener.com (March 20, 2019), available at https://www.marketscreener.com/BOEING-COMPANY-THE-4816/news/Boeing-An-Unmitigated-Reputational-Damage-28197554/.

## DEFENDANTS' FIDUCIARY STATUS UNDER ERISA

51.     ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

52.     The Committees were named fiduciaries of the Plans during the Class Period, with general authority to carry out essentially all fiduciary functions for the Plans.

53.     Defendants were members of the Committees responsible for exercising their primary fiduciary authority in relation to the Plan.

54.     ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they in fact perform a fiduciary function. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

55.     As the Seventh Circuit has previously recognized, "ERISA … defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan … thus expanding the universe of persons subject to fiduciary duties[.]" *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 916 (7th Cir. 2013) (quoting *Mertens v. Hewitt Assocs.*, 113 S. Ct. 2063, 2071).

56.     Here, the Committee Members exercised control and authority over the Plan as members of the Committees.

## ERISA'S FIDUCIARY DUTIES

57.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants

and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of a like character and with like aims.

58.     "As various courts have observed, the duties charged to an ERISA fiduciary are 'the

highest known to law." *George v. Kraft Foods Global, Inc.*, 814 F.Supp.2d 832, 852 (N.D. Ill.

2011).

59.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence. They entail, among other things:

(a) The duty to conduct an independent and thorough investigation into, and to continually

monitor, the merits of all the investment alternatives of a plan;

(b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A

fiduciary must always administer a plan with an "eye single" to interests of the

participants and beneficiaries, regardless of the interests of the fiduciaries themselves or

the plan sponsor; and

(c) The duty to disclose and inform, which encompasses: (1) a negative duty not to

misinform; (2) an affirmative duty to inform when the fiduciary knows or should know

that silence might be harmful; and (3) a duty to convey complete and accurate

information material to the circumstances of participants and beneficiaries.

60.     According to the Department of Labor ("DOL") regulations and case law

interpreting these statutory provisions, in order to comply with the prudence requirement under

ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those

facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary

16

knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

61.     Even though a plan may be designed, or even required, to hold stock of the plan's sponsor as an investment option, such as an employee stock ownership plan (an "ESOP"), plan fiduciaries are nevertheless subject to all of the ordinary fiduciary duties apart from the duty to diversify. As the Supreme Court explained, "because ESOP fiduciaries are ERISA fiduciaries and because § 1104(a)(1)(B)'s duty of prudence applies to all ERISA fiduciaries, ESOP fiduciaries are subject to the duty of prudence just as other ERISA fiduciaries are." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014). The Supreme Court held that these fiduciary duties trump even the instructions of the plan document: "the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Id.* at 2468.

62.     ERISA § 405 renders plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

## CLASS ACTION ALLEGATIONS

63.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(3) on behalf of a Class, consisting of all participants in or beneficiaries of any defined contribution plan sponsored by Boeing, its subsidiaries or its

affiliates, who purchased or held Boeing stock (or units of Boeing stock funds) through their plan accounts during the Class Period, excluding Defendants and the Court or any employees of the Court. As used herein, the term "Class Period" means the time beginning not later than October 29, 2018, when the First Crash occurred (or such earlier date that the disclosure of the truth to the public about Boeing's 737 MAX became inevitable) and continuing until March 31, 2019.

64.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Boeing and the Plan's administrators.

65.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants had actual or constructive knowledge that Boeing stock price was artificially inflated during the Class Period;

- Whether Defendants had the authority to make corrective disclosure for Boeing concerning the unsuitability of 737 MAX;

- Whether Defendants' failure to make corrective disclosure regarding the unsuitability of 737 MAX once those facts became inevitable caused Plaintiffs and the Plan to overpay for Boeing stock during the Class Period; and

- Whether Defendants' failure to make corrective disclosure regarding the unsuitability of 737 MAX once disclosure of those facts became inevitable caused additional declines to the value of Boeing stock held by Plaintiffs and the Plan as a result of the delayed disclosure.

67. There are no substantial individual questions among Class members on the merits of this action.

68. Plaintiffs' claims are typical of the members of the Class.

69. Plaintiffs have been injured by the alleged breaches of fiduciary duties and are committed to fairly, adequately, and vigorously representing and protecting the interests of Class members.

70. Plaintiffs have retained counsel who are experienced in class litigation in general and who have significant experience successfully representing ERISA plan participants in claims related to ERISA's fiduciary duties.

71. Neither Plaintiffs, nor their counsel, have any interests that would cause them to refrain from vigorously pursuing this action.

72. Plaintiffs are adequate class representatives.

73. Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

74. In the alternative, class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because common issues of law and fact predominate over questions affecting only

individual members of the Class and because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### All Defendants

75.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

76.     ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

77.     As alleged above, the Committees and the Individual Defendants were express fiduciaries for the Plans.

78.     The Committees and Individual Defendants, as the Plan's fiduciaries, could, and should have acted to protect the Plan, including making corrective disclosure publicly admitting the artificially inflated stock price of Boeing stock.

79.     However, the Committees and Individual Defendants did not take action to protect the Plan. The Committees and Individual Defendants failed to make any corrective disclosure, and in the interim Plaintiffs and the Class members continued to acquire and hold Boeing stock at an inflated price.

80.     Boeing knew about, and encouraged, Individual Defendants' failure to make appropriate corrective disclosures regarding its 737 MAX. Indeed, silence about Boeing's

artificially inflated stock price was part of Boeing's corporate strategy. Thus, the Individual Defendants' failure to make corrective disclosures was taken within the course and scope of their duties as members of the Committees, and Boeing knowingly participated in the Individual Defendants' fiduciary breaches.

81.     These actions, and failures to act, violated the duties of prudence and loyalty contained in ERISA § 404(a).

82.     ERISA § 502(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409.

83.     Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

84.     Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

85.     Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**COUNT II**
**Breach of Co-Fiduciary Duty**
**ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)**
**All Defendants**

86.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

87.     A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for

the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

88.     Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendants are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

89.     ERISA § 502(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409.

90.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2) and (a)(3), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

91.     Thus, Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

92.     Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable

22

relief including, but not limited to, constructive trust and equitable surcharge.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a);

B.     Declare that Defendants breached their fiduciary duties to the Plan;

C.     Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.     Order that Defendants make good to the Plan the losses resulting from their serial breaches of fiduciary duty;

E.     Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.     Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the Plans to the position they would have been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

G.     Award Plaintiffs' reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plan;

H.     Order Defendants to pay prejudgment interest; and

I.     Award such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  April 1, 2019

Respectfully submitted,

Diane Burke and Blake Parra, as participants in and on behalf of the Boeing Voluntary Investment Plan, and on behalf of a class of all others who are similarly situated,


By: */s/ Michael M. Mulder*
Michael M. Mulder
Elena N. Liveris
THE LAW OFFICES OF
MICHAEL M. MULDER
1603 Orrington Avenue, Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Todd Schneider*
James A. Bloom*
Kyle G. Bates*
Ryan M. Hecht*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Ste. 1400
Emeryville, California  94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com
rhecht@schneiderwallace.com


*Pro Hac Vice application forthcoming*

*Attorneys for Diane Burke and Blake Parra*