## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DIANE BURKE, ALEX PROESTAKIS, MIGUEL A. IBARRA and MOHAMMAD FAROOQ MUSTAFA , as participants in and on behalf of the Boeing Voluntary Investment Plan, and on behalf of a class of all others who are similarly situated, | : : : : : : | Civil Action No.: 19-cv-02203 |
| | : | Hon. Virginia M. Kendall |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| THE BOEING COMPANY, DAVID A. DOHNALEK, ROBERT E. VERBECK, THE BOEING EMPLOYEE BENEFIT PLANS COMMITTEE, THE BOEING EMPLOYEE BENEFIT INVESTMENT COMMITTEE, AND JOHN DOES 1-25 | : : : : : | |
| *Defendants.* | : : | |

## **FIRST AMENDED COMPLAINT**

Plaintiffs Diane Burke, Alex Proestakis, Miguel A. Ibarra and  Mohammad Farooq

Mustafa ("Plaintiffs"), participants in the Boeing Voluntary Investment Plan (the "Plan"), bring

this action in a representative capacity on behalf of the Plan, and as a class action on behalf of all

other similarly situated participants in and beneficiaries of defined contribution plans (the

"Plans") sponsored by Defendant the Boeing Company ("Boeing") against Boeing, David A.

Dohnalek, Robert E. Verbeck, the Employee Benefit Plans Committee ("EBPC" or the "Plans

Committee"), the Employee Benefit Investment Committee (the "EBIC" or the "Investment

Committee," together with the EBPC the "Committees"), and John Does 1-25, who were

members of the Committees (the "Committee Members," and together with Dohnalek and

Verbeck, the "Individual Defendants"). Plaintiffs bring this action under Sections 502(a)(2) and

502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29

U.S.C. §§ 1132(a)(2) and 1132(a)(3). By this action, Plaintiffs seek relief for the Plan for Defendants' breaches of their ERISA fiduciary duties as set forth herein.

1.      The Individual Defendants are among the Plan's named fiduciaries pursuant to ERISA § 402(a), or were *de facto* fiduciaries pursuant to ERISA § 3(21)(a). As ERISA fiduciaries, Defendants owe strict fiduciary duties of loyalty and prudence to the Plan and the participants in and beneficiaries of the Plan. ERISA § 404(a), 29 U.S.C. § 1104(a). ERISA's fiduciary duties are "the highest known to the law." *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011).

2.      The Plan is designed to help Boeing's employees save for retirement. The Plan is a defined contribution retirement plans. Defined contribution plans "provide[] for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

3.      Thus, and unlike traditional defined benefit pensions, in defined contribution plans like the Plan, participants at retirement are entitled to no more than the balance in their individual accounts. As the Supreme Court explained in 2015, in defined contribution plans employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

4.      At all relevant times, the Plan included as an investment option the VIP Stock Fund designed to invest in shares of stock of Boeing, the Plan's sponsor and the employer of the participants in the Plan. Plaintiffs invested in the VIP Stock Fund through their accounts in the Plan during the time period between January 8, 2019 and May 14, 2019, inclusive (the "Class

2

Period").

5.      However, for many years Boeing's stock price has been artificially inflated. The 737 model commercial jet has been Boeing's bestselling aircraft for decades, and the recently developed Boeing 737 MAX series are the core of Boeing's growth plans.

6.      Boeing had a problem going back to at least 2010. One of the biggest factors in airline operation expense is the cost of fuel. Technological advances in jet propulsion resulted in the development of more fuel-efficient engines. But those new engines were larger in diameter than the older, less efficient engines; the engines that were installed on Boeing's original 737 series of airplanes. More importantly, the overall design of the 737 airframe, particularly the distance between the wing and the ground, was lower than the airframes of Boeing's biggest competitors. As a result, the newer more fuel-efficient jet engines could not be easily installed on the 737. However, Boeing decided that the cost of developing an entirely new plane designed to accommodate the newer, larger engines would be staggering. So, Boeing engineers figured out a way to install the new engines on the old airframe. In August 2011, Boeing announced that it had lined up orders for 496 Boeing 737 aircraft retro-fitted with new engines from five different airlines.

7.      But the new engines had to be mounted higher and more forward than did the original engines, which materially changed the balance and accordingly, the flight characteristics of the plane.[1]

8.      As a result, the flight control systems had to be changed in order to manage the

---

[1] "The real reason Boeing's new plane crashed twice," Vox, April 15, 2019, available at https://www.vox.com/videos/2019/4/15/18306644/boeing-737-max-crash-video (last viewed April 16, 2019).

altered flight characteristics. Because the engines were moved forward, the plane would tend to be more nose-heavy, so the flight control systems had to be modified to keep the nose up and maintain proper aerodynamics. This meant increasing the plane's "angle-of-attack." The angle-of-attack is the angle of the wing relative to the plane's vector, or direction of travel. When a plane is flying straight and level, the angle-of-attack might be zero or close to zero. When a plane is ascending, the angle-of-attack will be higher. If the angle-of-attack is too high relative to the speed of the plane, it can cause a disruption of the airflow over the wing and a complete loss of lift, resulting in a "stall." When a stall occurs, the plane literally starts falling from the sky. The remedy to prevent a stall from occurring is to lower the nose of the aircraft, reducing the angle of attack and re-establishing consistent airflow over the wing.[2]

9.      Planes have sensors in the wings to warn of an impending stall, and commercial planes have systems that will automatically lower the nose in order to prevent a stall. The systems installed in the 737 MAX designed to offset the imbalance resulting from the placement of the new engines had problems on takeoff, the time during which the angle of attack is the greatest. Sensors indicated danger of a stall and forced the nose of the plane down after activation of the new Maneuvering Characteristics Augmentation System or "MCAS."

10.      A graphic of the MCAS and how it operates on a 737 MAX is below:[3]

---

[2] *See, generally,* Mathew Yglesias "The emerging 737 MAX scandal, explained," Vox, March 29, 2019, available at https://www.vox.com/business-and-finance/2019/3/29/18281270/737-max-faa-scandal-explained (last viewed March 29, 2019).

[3] "Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system," March 17, 2019, *The Seattle Times*, available at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/



11.    The problem of being nose-heavy was noticed by pilots.  According to a Dallas

Morning News review of voluntary aircraft incident reports to a NASA database in October and

November 2018:

> The disclosures found by the News reference problems with an autopilot
> system, and they all occurred during the ascent after takeoff. Many
> mentioned the plane suddenly nosing down. While records show these
> flights occurred in October and November, the airlines the pilots were
> flying for is redacted from the database.[4]

12.    Boeing was aware enough of the problem to have created a warning light system

if there was a problem with the angle-of-attack sensors on the 737 MAX.  But rather than make

that warning light system standard equipment on the plane, it was an $80,000 optional add-on.[5]

---

[4]"Several Boeing 737 Max 8 pilots in U.S. complained about suspected safety flaw," Dallas
News, March 12, 2019, available at
https://www.dallasnews.com/business/airlines/2019/03/12/boeing-737-max-8-pilots-complained-
feds-months-suspected-safety-
flaw?utm_content=bufferffc95&utm_medium=social&utm_source=twitter.com&utm_campaign
=buffer (last viewed March 29, 2019).
[5] "Boeing to make standard an $80,000 warning light that was not on doomed planes," CBS
Morning News, available at https://www.cbsnews.com/news/boeing-737-max-plane-crash-

13.     Only about 20% of Boeing's customers purchased the optional warning light system, thus the warning light was not working on most of Boeing's new jets.[6]

14.     Boeing has declined to disclose the full menu of safety features it offers as options on the 737 MAX, or how much they cost.[7]

15.     In earlier 737 models, there were computer-generated alerts that appeared as colored lights on the cockpit when a plane's twin angle-of-attack sensors provide significantly different data from each other. [8]

16.     But Boeing concealed the fact that it had turned off the feature in the MAX aircraft, called "AOA disagree alerts," for Southwest Airlines Company and other carriers.[9]

---

company-to-make-standard-light-warning-pilots-of-sensor-malfunction/ (last viewed March 29, 2019).

[6] "Boeing Believed a 737 Max Warning Light Was Standard. It Wasn't," *The New York Times*, May 5, 2019, available at https://www.nytimes.com/2019/05/05/business/boeing-737-max-warning-light.html.

"Even for those airlines that did purchase the optional safety indicator, like American Airlines, Boeing created confusion among pilots as to how the indicator properly worked. Pilots were told that if the angle-of-attack sensors were 'in massive difference, [they] would receive an alert on the ground and therefore not even take off.'"  Boeing more recently told pilots, however, "that the system would not alert pilots about any sensor disagreement until the aircraft is 400 feet above the ground."  *Id.*; *see also "*Long before first 737 MAX crash, Boeing knew a key sensor warning light wasn't working, but told no one," *The Seattle Times*, May 5, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/long-before-first-737-max-crash-boeing-knew-a-key-sensor-warning-light-wasnt-working-but-told-no-one/?utm_source=email&utm_medium=email&utm_campaign=article_inset_1.1.

[7] "Doomed Boeing Jets Lacked 2 Safety Features That the Company Sold Only as Extras," *The New York Times*, March 21, 2019, available at https://www.nytimes.com/2019/03/21/business/boeing-safety-features-charge.html

[8] "Boeing's Enduring Puzzle," *The Wall Street Journal*, available at https://www.wsj.com/articles/boeings-enduring-puzzle-why-certain-safety-features-on-737-max-jets-were-turned-off-11556456400?mod=hp_lead_pos1

[9] *Id.*

6

17.     According to government and industry officials, Federal Aviation Administration ("FAA") safety inspectors and supervisors responsible for monitoring Southwest, the largest 737 MAX customer, also were unaware of the change.[10]

18.     Boeing did not disclose this safety defect until after it was reported in *The Wall Street Journal*.[11]

19.     On April 29, 2019, Boeing stated that it "realized the [angle-of-attack disagree] alerts were not operating several months after the first deliveries of the model, which was certified to carry passengers in March 2017."[12]  In fact, Boeing discovered by May 2017 that the warning light was faulty.[13]  Boeing "told different airlines months apart from one another that the cockpit alerts—intended to warn pilots about certain sensor malfunctions—didn't work on most of the global 737 MAX fleet as originally designed, due to a software error."[14]

---

[10] *Id.*

[11] "Boeing Signals Additional Software Problem Affecting 737 MAX Airliners," *The Wall Street Journal*, April 30, 2019, available at https://www.wsj.com/articles/boeing-signals-additional-software-problem-affecting-737-max-airliners-11556592646

[12] "Boeing Knew About Safety-Alert Problem for a Year Before Telling FAA, Airlines," *The Wall Street Journal*, May 5, 2019, available at https://www.wsj.com/articles/boeing-knew-about-safety-alert-problem-for-a-year-before-telling-faa-airlines-11557087129?shareToken=sta3656081a105470b9709f270db99e142&reflink=article_email_share

[13] *"Long before first 737 MAX crash, Boeing knew a key sensor warning light wasn't working, but told no one," *The Seattle Times*, May 5, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/long-before-first-737-max-crash-boeing-knew-a-key-sensor-warning-light-wasnt-working-but-told-no-one/?utm_source=email&utm_medium=email&utm_campaign=article_inset_1.1

[14] "Boeing Knew About Safety-Alert Problem for a Year Before Telling FAA, Airlines," *The Wall Street Journal*, May 5, 2019, available at https://www.wsj.com/articles/boeing-knew-about-safety-alert-problem-for-a-year-before-telling-faa-airlines-11557087129?shareToken=sta3656081a105470b9709f270db99e142&reflink=article_email_share

20.    In addition to concealing the information about the safety disagree alert being shut down, Boeing concealed information about the MCAS flight control system from airlines and pilots flying the 737 MAX jets.[15]

21.    Also, at least by 2017, Boeing's legal department and executives knew or should have known the 737 MAX jet was defective, at least under certain conditions, and therefore the Company's stock was overvalued.

22.    In a 2017 legal document, Boeing said that large, upgraded 737 MAX jets "cannot be used at what are referred to as 'high/hot' airports." This statement is reflected in the 2018 U.S. International Trade Commission final report: "The ability of the 737-700 and MAX 7 to serve airports characterized by shorter runways, higher temperature, and higher altitudes, as discussed above, further **limits the ability** to use large single-aisle LCA [737 Max 8 and 9] in place of the 737-700 and Max 7" (emphasis added).[16]

23.    Defendants knew or should have known that the MAX jet was unsafe to fly because it had installed the MCAS that could automatically take control of the plane, where Boeing failed to disclose the existence of MCAS to the airlines and pilots.  Boeing failed, however, to warn pilots that they were the back-up to this automatic system, it did not train pilots on the system, and it did not include instructions about the system in the pilot manuals.

24.    Defendants knew or should have known that MCAS was flawed because it could

---

[15] "Boeing Withheld Information on 737 Model, According to Safety Experts and Others," *The Wall Street Journal*, November 13, 2018, available at https://www.wsj.com/articles/boeing-withheld-information-on-737-model-according-to-safety-experts-and-others-1542082575
[16]*See* U.S. International Trade Commission Determination, February 2018, Investigation Nos. 701-TA-578 and 731-TA-1368. *See too* "Boeing Has Called 737 Max 8 'Not Suitable' for Certain Airports," *Bloomberg*, April 11, 2019, available at https://www.bloombergquint.com/business/boeing-has-called-737-max-8-not-suitable-for-certain-airports.

be automatically triggered by a single erroneous reading from a flight sensor -- the kind of sensor that frequently failed in the past -- and that the MCAS was programmed to repeatedly drive the nose of the plane down without cut-off on its repetitive behavior.

25.     Defendants also knew and concealed the fact that the 737 MAX jet had a faulty warning light system when the sensors disagreed or no longer operated, which was contrary to the description in the pilot manuals.

26.     These represented major engineering and manufacturing issues that were sure to have a significant impact on Boeing's future operations, as it would have been well-known and highly discussed within upper echelons of Boeing management.  Boeing's senior management received numerous reports on the progress and testing of the necessary engineering solutions. The reported problems with flight controls would have been widely discussed among senior Boeing executives, and the decision to make the warning light system an optional add-on, were analyzed, reviewed and discussed among Boeing executives well beyond the engineering divisions, and included finance, sales and marketing.  Boeing's senior management, including the members of the Executive Council and the Individual Defendants, knew or should have known about all of the serious safety problems and proposed work-arounds throughout the Class Period, as well as its failure to provide pilots any information or training about MCAS and the plane's suitability for certain airports.

27.     Thus, Boeing and the Individual Defendants knew, at least by May 2017, that the 737 MAX faced crucial safety problems. Indeed, Boeing knew or should have known that if the truth about the safety problems with its 737 MAX aircraft were to materialize and become publicly known, it would lead to massive disruptions in the demand for the 737 MAX and significant reputational harm, as well as a large downward correction in the value of Boeing's

stock. In October 2018, these safety problems in the 737 MAX tragically manifested themselves in the crash of a 737 MAX in Indonesia.

28.     On October 29, 2018, a Boeing 737 MAX 8 aircraft, operated by Lion Air as Lion Air Flight JT 610, crashed into the Java Sea killing everyone on board.

29.     Between October of 2018 and January of 2019, Boeing and Indonesian crash investigators searched for the reasons for the crash. In January 2019, the cockpit voice recorders for the Indonesian jet were discovered.[17] The voice recorders were "a crucial development in determining exactly what went wrong."[18] While Indonesia has not yet published its final report detailing the contents of the cockpit voice recorder, information made public to date shows that the cockpit voice recorder confirms the pilots were struggling with the very problems with the 737 MAX's MCAS system that Boeing had been aware of. For example, "[i]n the cockpit voice recording, the pilots discussed unreliable airspeed and altitude readings they were getting…"[19] The Guardian, reporting on the voice recorder, stated that "airspeed was mentioned on the cockpit voice recording, and that an indicator showed a problem on the captain's display but not the first officer's."[20]

30.     Those recordings made it clear to Boeing that the MCAS problems with the 737

---

[17] "Cockpit Voice Recorder Recovered From Indonesia's Lion Air Crash, Investigators Hope the Recorder Will Shed Light on the Flight's Final Moments," *The Wall Street Journal* (Jan. 14, 2019).
[18] "Authorities Find Cockpit Voice Recorder of Crashed Lion Air Flight 610," Popular Mechanics (Jan. 14, 2019), https://www.popularmechanics.com/flight/airlines/a25892285/lion-air-flight-610-cockpit-voice-recorder-discovery/
[19] "Confusion, Then Prayer, in Cockpit of Doomed Lion Air Jet," New York Times (Mar. 20, 2019), available at: https://www.nytimes.com/2019/03/20/world/asia/lion-air-crash-boeing.html
[20] "Lion Air pilots were looking at handbook when plane crashed," The Guardian (Mar. 20, 2019), available at: https://www.theguardian.com/world/2019/mar/20/lion-air-pilots-were-looking-at-handbook-when-plane-crashed?CMP=share_btn_link

MAX were the cause of the first crash.

31.     As such, by January 2019 at the latest, Boeing knew that the MCAS problems with the 737 MAX had resulted in the Indonesian crash, and it was or should have been clear to all of Boeing's senior management, including the Individual Defendants, that public disclosure of the significant safety problems with the 737 MAX was inevitable. At that juncture, Boeing could have taken many actions to protect those who owned and purchased its shares, especially warning investors that problems with the 737 MAX could materially hamper Boeing's production and profitability estimates. Yet Boeing did not disclose these problems publicly. Boeing's failure to disclose the serious safety problems with its 737 MAX aircraft left the investing public unaware of these issues, and caused the price of Boeing stock to be artificially inflated.

32.     That Boeing knew of safety issues with respect to its 737 MAX jets but had concealed them prior to the first crash, is evident from the fact that one week after the first crash, on November 6, 2018, Boeing issued an Operations Manual Bulletin ("OMB") to all 737 MAX operators across the world.  The OMB cautioned them that a sensor failure could cause a new MAX flight-control system to automatically swivel upward the horizontal tail—also called the stabilizer—and push the jet's nose down.[21]

33.     Boeing warned airlines that erroneous sensor readings from the flight control system could "cause the flight crew to have difficulty controlling the airplane," and lead to

---

[21] "Why Boeing's emergency directions may have failed to save 737 MAX," *The Seattle Times*, April 3, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/boeings-emergency-procedure-for-737-max-may-have-failed-on-ethiopian-flight/

"possible impact with terrain."[22]

34.     Boeing explained in the OMB that a feature in previous 737 models that allowed pilots to manually override an "electric trimming" process—which can automatically nudge the nose of the plane downturned in certain situations—does not work in Boeing's 737 MAX planes.[23]

35.     Boeing laid out the following response in the OMB:  Hit a pair of cutoff switches to turn off the electrical motor that moves the stabilizer, disabling the MCAS.  Then swivel the tail down manually by turning a large stabilizer trim wheel, next to the pilot's seat, that connects mechanically to the tail via cables.

36.     Boeing otherwise defended the plane's safety features in the weeks after the first crash and publicly resisted calls to make changes to its system and pilot training procedures.[24]

37.     Despite Boeing's knowledge of the safety issues with the 737 MAX jets, Boeing said the following in a November 28, 2018 press release:

> Safety is a core value for everyone at Boeing and the safety of our airplanes, our customers' passengers and their crews is always our top priority. ***As our customers and their passengers continue to fly the 737 MAX to hundreds of destinations around the world every day, they have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies.***

38.     On March 10, 2019, a Boeing 737 MAX 8 aircraft, operated by Ethiopian Airlines, as Ethiopian Flight 302, crashed southeast of Addis Ababa, near the Ejene village,

---

[22] "Pilots unions accuse Boeing of withholding safety information," November 13, 2018, available at https://www.washingtonpost.com/business/2018/11/13/pilots-unions-criticize-boeing-withholding-safety-information/?utm_term=.dbe4c0eba0da
[23] *Id.*
[24] *See* "Boeing, initially defensive, now 'humbled' by 737 crisis," *The Washington Post*, March 27, 2019, available at https://www.washingtonpost.com/business/2019/03/27/boeing-initially-defensive-now-humbled-by-max-crisis/?utm_term=.62d46e19c9d7.

killing everyone on board.

39.     In the wake of the second crash, Boeing's operations have suffered significant setbacks. Almost every country in the world has grounded 737 MAX aircraft, and new deliveries have been put on hold. The market has reacted to this news accordingly, and Boeing's share price plunged more than $65 per share, from $442.54 on Friday, March 8, 2019 to $375.41 on Tuesday, March 12, 2019 in the wake of the second crash, as the public gradually became aware that Boeing had concealed these serious safety issues.

40.     In a video message released on April 4, 2019, Boeing Chairman, President and CEO Dennis Muilenberg conceded: "The full details of what happened in the two accidents will be issued by the government authorities in the final reports, but, with the release of the preliminary report of the Ethiopian Airlines Flight 302 accident investigation, it's apparent that in both flights the Maneuvering Characteristics Augmentation System, known as MCAS, activated in response to erroneous angle of attack information."[25]

41.     The Individual Defendants, who serve as the Plan's fiduciaries, include senior executives of Boeing and at least one member of Boeing's Executive Council. Mr. Dohnalek, for example, is Boeing's Senior Vice President of Finance and its Corporate Treasurer.

42.     Defendants knew or should have known that Boeing's stock price was artificially inflated in value, and knew that many of the Plan's participants, including Plaintiffs, allocated significant portions of their retirement savings to Boeing stock and made additional purchases of Boeing stock for their retirement savings accounts in the Plan on an ongoing basis.

---

[25] "Boeing CEO Dennis Muilenberg Addresses the Ethiopian Airlines Flight 302 Preliminary Report," *PR Newswire*, April 4 2019, available at https://www.prnewswire.com/news-releases/boeing-ceo-dennis-muilenburg-addresses-the-ethiopian-airlines-flight-302-preliminary-report-300825008.html.

43.     Defendants failed to take any action to protect the Plans and their participants. In particular, Defendants failed to disclose the truth about the safety problems with the 737 MAX publicly, even as it became inevitable that the public would learn about these safety problems. Defendants stayed quiet as the Plan's participants, including Plaintiffs, continued to purchase and hold Boeing stock at the inflated price in their retirement savings accounts.

44.     Boeing's reputation has been seriously damaged by its concealment of the safety problems with the 737 MAX, and that reputational harm has been felt by Boeing's shareholders, including Plaintiffs and the other Plan participants who included Boeing shares in their retirement savings.

## JURISDICTION AND VENUE

45.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (3).

46.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

47.     This Court has general personal jurisdiction over Defendant Boeing, which is incorporated in this District, and over any other defendants that reside in this District. This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this District through the management of the Plan.

48.     Pursuant to 29 U.S.C. § 1132(e)(2) venue is proper in this District because the breaches described herein occurred in this District. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a substantial part of the events or omissions giving rise to the claim occurred in this District.

14

## PARTIES

49. The Plan is an employee benefit plan and employee pension benefit plan covered by ERISA within the meaning of ERISA § 3(2)(A) & (7), 29 U.S.C. § 1002(2)(A) & (7).

50. Plaintiff Diane Burke is an individual residing in Tacoma, Washington, and at all relevant times has been a participant in the Plan. Plaintiff Burke purchased and owned units of the Boeing stock fund through her account in the Plan during the Class Period.

51. Plaintiff Alex Proestakis is an individual residing in Salt Lake City, Utah, and at all relevant times has been a participant in the Plan. Plaintiff Proestakis purchased and owned units of the Boeing stock fund through his account in the Plan during the Class Period.

52. Plaintiff Miguel A. Ibarra is an individual residing in Seattle, Washington, and at all relevant times has been a participant in the Plan. Plaintiff Mustafa purchased and owned units of the Boeing stock fund through his account in the Plan during the Class Period.

53. Plaintiff Mohammad Farooq Mustafa is an individual residing in Clarksville, Maryland, and at all relevant times has been a participant in the Plan. Plaintiff Mustafa purchased and owned units of the Boeing stock fund through his account in the Plan during the Class Period.

54. Defendant Boeing, together with its subsidiaries, is an American multinational corporation that designs, manufactures, and sells airplanes, rotorcraft, rockets, satellites, and missiles worldwide. According to its own website, "Boeing is the world's largest aerospace company and leading manufacturer of commercial jetliners, defense, space and security systems, and service provider of aftermarket support. As America's biggest manufacturing exporter, the company supports airlines and U.S. and allied government customers in more than 150

countries."[26] Boeing is incorporated in Delaware and is headquartered in Chicago, Illinois. Boeing's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BA".

55.     Defendant Employee Benefit Plans Committee is the Plan Administrator pursuant to ERISA § 3(16). The Committee is comprised of Boeing officers and employees.

56.     Defendant Employee Benefit Investment Committee is a fiduciary of the Plan and all of the assets of all Boeing employee benefit plans. The Boeing Board of Directors has appointed the EBIC as a Plan fiduciary. The Boeing Board of Directors has delegated to the EBIC authority to invest, reinvest and manage assets of all Boeing employee benefit plans and to select and monitor the investment options for the Plan. The Boeing Board of Directors has authorized the EBIC to select, hire, retain, appoint, replace and/or terminate plan trustees, investment managers, mutual funds, vendors, and advisers.

57.     Many of the Committee Members are among the most senior executives at Boeing and at least one Committee Member serves on Boeing's Executive Council.

58.     The Individual Defendants are all members of the Committees, and all had knowledge of the truth about the problems with the Boeing 737 MAX series and had authority to make disclosures on behalf of Boeing to the SEC.

Each of the Individual Defendants:

- Was, as a Committee Member, directly responsible for the management of the Plan;

- Was directly involved in the day-to-day operations of Boeing at the highest levels;

---

[26] *See* https://www.boeing.com/company/.

- Was privy to confidential proprietary information concerning Boeing and its business and operations;

- Owed a fiduciary duty to the Plan; and

- Failed to take any steps to ensure that the truth about the safety of the 737 MAX was disclosed to the public.

**FACTUAL ALLEGATIONS**

**A. The 737 MAX Design Flaws**

59.     The 737 series are narrow bodied, twin engine passenger airliners with a short to medium range. The 737 has been continuously manufactured since 1967, and the first 737 entered service with Lufthansa in 1968. Boeing has manufactured and delivered more than 10,000 aircraft in the 737 series.

60.     The two biggest airplane manufacturers in the world are Airbus and Boeing, and they have a fierce rivalry. If one of them can offer a better plane, the other could lose a substantial amount of money.[27]

61.     In 2010, Airbus announced that it would update its most popular model, the A320, a single-aisle airplane that services many domestic flights.[28]

62.     For this new plane called the A320neo, Airbus would add a new kind of engine. It was much larger than the previous engine, but it would make the plane 15% more fuel-efficient.

---

[27] "The real reason Boeing's new plane crashed twice," *Vox*, April 15, 2019, available at https://www.vox.com/videos/2019/4/15/18306644/boeing-737-max-crash-video (last viewed April 16, 2019).
[28] *Id.*

This upgrade would not change the plane that much. The new model would not require much

additional training which would save airlines money.[29]

63.    Boeing had been exploring the construction of an all-new airplane earlier this

decade.  But after American Airlines began discussing ordering the new plane from Airbus in

2011, Boeing changed course, setting on the faster alternative of modifying its popular 737

airplane into a new model.[30]

64.    To compete with Airbus, Boeing's obvious move was to update the engine on

their single-aisle plane, the Boeing 737-800. But there was an issue to overcome. As seen in this

sketch of the 737 next to the Airbus A320, the 737 is lower to the ground than the A320. This

meant Airbus could slide a new larger engine in under the wing of their A320, but there was not

enough room under the wing of the Boeing 737.[31]



---

[29] *Id.*

[30]"FAA had initial version of Boeing's proposed 737 MAX software fix seven weeks before the Ethiopian crash," *The Seattle Times*, March 26, 2019, available at
https://www.seattletimes.com/business/boeing-aerospace/faa-had-initial-version-of-boeings-proposed-software-fix-seven-weeks-before-the-ethiopian-crash/.

[31]"The real reason Boeing's new plane crashed twice," *Vox*, April 15, 2019, available at
https://www.vox.com/videos/2019/4/15/18306644/boeing-737-max-crash-video

18

65.     In fact, when Boeing moved the engine up for the 737 MAX, the top of the engine was above the wing.[32]



66.     Moving the engine up on the 737 had a side-effect. When the 737 MAX was in full thrust, like during takeoff, the nose tended to point too far upward, which would lead to a stall. This was a problem, because these planes were supposed to behave exactly like the old ones.[33]

67.     Boeing came up with a work-around. Instead of reengineering the planes, it installed software that automatically pushed the nose downward if the pilot flew the plane at too high of an angle. Boeing called it the Maneuvering Characteristics Augmentation System, or MCAS.[34]

68.     The MCAS provided a software solution to prevent the 737 MAX from stalling. When the pilots have switched off the autopilot, the angle-of-attack is too high, the flaps are up,

---

[32]*Id.*
[33] "The emerging 737 MAX scandal, explained," *Vox*, March 29, 2019, available at https://www.vox.com/business-and-finance/2019/3/29/18281270/737-max-faa-scandal-explained
[34] *Id.*

and the aircraft is going through a steep turn, MCAS turns itself on.[35]

69.     The 737 MAX jets came equipped with two sensors, but only one fed into MCAS at any given time.[36]

70.     One problem with Boeing's design was that if one sensor malfunctions, the plane may not be able to automatically determine which of the two readings is correct.[37]

71.     Boeing has indicated that the MCAS safety system will not function when the sensors record substantial disagreement.[38]

72.     Boeing's design meant that if a sensor failed and the MCAS system erroneously engaged to automatically push the nose of the plane down, the flight crew would be the fail-safe backup to override the malfunctioning safety system.[39]

73.     Despite these design flaws, Boeing launched the 737 MAX series on August 30, 2011 as an upgraded version of the earlier 737s, designed to deliver improved fuel efficiency and lower operating costs. Boeing specifically intended the 737 MAX for the rapidly growing Asian market, and in particular, the Chinese market. Boeing has predicted China will soon become the world's first trillion-dollar market for jets. Boeing estimates that China will need 7,690 commercial jets by 2037. As of 2019, Chinese airlines have ordered 180 of the 737 MAX

---

[35]"Is Boeing Canceling the 737 Max?" *AviationCV*, March 13, 2019, available at
https://www.aviationcv.com/aviation-blog/2019/boeing-canceling-737-max
[36] "Between Two Deadly Crashes, Boeing Moved Haltingly," *The Wall Street Journal*, April 2, 2019, available at https://www.wsj.com/articles/between-two-deadly-crashes-boeing-moved-haltingly-to-make-737-max-fixes-11554164171
[37] "Is Boeing Canceling the 737 Max?" *AviationCV*, March 13, 2019, available at
https://www.aviationcv.com/aviation-blog/2019/boeing-canceling-737-max
[38] *Id.*
[39] *Id. See also* "FAA had initial version of Boeing's proposed 737 MAX software fix seven weeks before the Ethiopian crash," *The Seattle Times*, March 26, 2019, available at
https://www.seattletimes.com/business/boeing-aerospace/faa-had-initial-version-of-boeings-proposed-software-fix-seven-weeks-before-the-ethiopian-crash/

aircraft, of which 76 have been delivered.

74.     The 737 MAX performed its first flight in January 2016, and gained FAA certification on March 8, 2017. The first delivery of a 737 MAX was to Malindo Air, a Malaysian airline, on May 6, 2017. By mid-2018, Boeing was producing 52 of the 737 MAX aircraft each month.

75.     Furthermore, because Boeing was selling the 737 MAX as more-or-less the same plane as the 737, it did not warn airlines or provide training on the new MCAS system. Most pilots only received a two-hour iPad training course before entering the 737 MAX cockpit for the first time. The pilot training materials did not include any information about the MCAS or that the software was a form of artificial intelligence that could automatically turn itself on in certain situations and would engage if one of the sensors malfunctioned.[40]

76.     Prior to the first crash in October 2018, complaints about "inadequate training" on the Boeing 737 MAX had been reported on NASA's Aviation Safety Reporting System (ASRS). Reporting on a flight in June 2018, a first officer on his first MAX jet flight said:

> My post flight evaluation is that we lacked the knowledge to operate the aircraft in all weather and aircraft states safely. The instrumentation is completely different- my scan was degraded, slow and labored having had no experience w/ the new ND (Navigation Display) and ADI (Attitude Director Indicator) presentations/format or functions (manipulation between the screens and systems pages were not provided in training materials. If they were, I had no recollection of that material).
>
> We were unable to navigate to systems pages and lacked the knowledge of what systems information was available to us in the different phases of

---

[40] "After 2 Crashes of Boeing Jet, Pilot Training Now a Focus," *The New York Times*, March 16, 2019, available at https://www.nytimes.com/2019/03/16/business/boeing-max-flight-simulator-ethiopia-lion-air.html.

flight. Our weather radar competency was inadequate to safely navigate significant weather on that dark and stormy night. These are just a few issues that were not addressed in our training.[41]

77.    In November 2018, after the first crash, there were additional reports on ASRS criticizing lack of information on the 737 MAX jets, including concerns that some systems such as the MCAS are not fully described in the aircraft Flight Manual. A pilot criticized a newly released 737 MAX Emerging Airworthiness Directive because it did nothing to address the systems issue with the angle-of-attack system:

> I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models. The fact that this airplane requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone—even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes.
>
> I am left to wonder: what else don't I know? The Flight Manual is inadequate and almost criminally insufficient. All airlines that operate the MAX must insist that Boeing must incorporate ALL systems in their manuals.[42]

78.    The FAA certification process for the 737 MAX jets was rushed, as Boeing sought to catch up to Airbus' new plane.

79.    Multiple stories in *The Seattle Times* report that the FAA delegated to Boeing

---

[41] "Here's what was on record about problems with the 737 MAX," *The Atlantic*, March 13, 2019, available at https://www.theatlantic.com/notes/2019/03/heres-what-was-on-the-record-about-problems-with-the-737-max/584791/

[42] *Id.*

itself the safety[43] analysis of the MCAS flight control system.[44]

80. According to *The Seattle Times*, the original safety analysis that Boeing delivered to the FAA for a new flight control system on the 737 MAX, the MCAS, had several critical flaws. Boeing's Chairman, President and CEO, Dennis Muilenberg, would later admit that the MCAS was involved in the two accidents, saying that Boeing "…will eliminate the possibility of unintended MCAS activation and prevent an MCAS-related accident from ever happening again."[45]

81. *The Seattle Times* "Flawed Analysis" story was based on current and former engineers directly involved or familiar with the safety evaluations conducted by Boeing of the MCAS. The flaws in the safety analysis included:

- Understated the power of the new flight control system, which was designed to swivel the horizontal tail to push the nose of the plane down to avert a stall. When the planes later entered service, MCAS was capable of moving the tail more than four times farther than was stated in the initial safety analysis document.
- Failed to account for how the system could reset itself each time a pilot responded, thereby missing the potential impact of the system repeatedly pushing the airplane's nose downward.
- Assessed a failure of the system as one level below "catastrophic." But even that "hazardous" danger level should have precluded

---

[43] "Ethiopia Wavers on Timing of Report on Boeing 737 Max Jet Crash," *The Seattle Times*, April 1, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/preliminary-report-due-today-on-737-max-crash-in-ethiopia/.

[44] "Flawed Analysis, Failed Oversight: How Boeing, FAA certified the suspect 737 MAX flight control system," *The Seattle Times*, March 17, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/.

[45] "Boeing CEO Dennis Muilenburg Addresses the Ethiopian Airlines Flight 302 Preliminary Report," Boeing, April 4, 2019, available at https://boeing.mediaroom.com/2019-04-04-Boeing-CEO-Dennis-Muilenburg-Addresses-the-Ethiopian-Airlines-Flight-302-Preliminary-Report

activation of the system based on input from a single sensor—and yet that's how it was designed.[46]

82.     Safety engineers familiar with the safety analysis documents also shared details with *The Seattle Times* suggesting the design of the MCAS included crucial flaws.[47]

83.     One of the criticisms concerned Boeing's design of an automated safety system that abandoned the principles of component redundancy, ultimately entrusting automated decision-making to just one angle-of-attack sensor located on either side of the jet.

84.     The MCAS system was programmed to push the plane's nose down if a single angle-of-attack sensor told MCAS it was in danger of going into a stall.

85.     Boeing knew or should have known that this type of sensor was known to fail.[48] The FAA's Service Difficulty Reporting shows that since 2004 the FAA has received over 200 reports of angle-of-attack sensors failing, or having to be repaired, replaced, or adjusted.[49]

86.     About one-fifth of those reports involve Boeing planes, and include incidents in which angle-of-attack sensors were frozen, improperly installed, struck by lightning, or even hit

---

[46] Flawed Analysis, Failed Oversight: How Boeing, FAA
certified the suspect 737 MAX flight control system," *The Seattle Times*, March 17, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/.
[47] *Id.*
[48] *See, e.g.,* "Boeing failed to apply safety lesson from deadly 2009 crash," *The Seattle Times*, May 7, 2019, available at https://www.seattletimes.com/business/boeing-failed-to-apply-safety-lesson-from-deadly-2009-crash/?utm_source=email&utm_medium=email&utm_campaign=article_inset_1.1
[49] "Lack of redundancies on Boeing 737 MAX system baffles some involved in developing the jet," *The Seattle Times*, March 26, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/a-lack-of-redundancies-on-737-max-system-has-baffled-even-those-who-worked-on-the-jet/. *See also* "Boeing relied on single sensor for 737 Max that had been flagged 216 times to FAA," *CNN*, April 30, 2019, available at https://amp.cnn.com/cnn/2019/04/30/politics/boeing-sensor-737-max-faa/index.html.

by flying birds.[50]

87.     Boeing's rival, Airbus, has typically depended on three such sensors.  For Boeing to have a third sensor to help ferret out an erroneous reading could require a physical retrofit of the 737 MAX.[51]

88.     *The Seattle Times* quotes "Rick Ludtke, a former Boeing engineer who worked on designing the interfaces on the [737] MAX's flight deck, [that] managers mandated that any differences from the previous 737 had to be small enough that they would not trigger the need for pilots to undergo new simulator training."[52]

89.     "That left the [Boeing] team working on an old architecture and layers of different design philosophies that had piled up over the years, all to serve an international pilot community that was increasingly expecting automation."  Ludtke said, "'It's become such a kludge, that we

_____

[50] *Id*.

[51] *Id*.

[52] *Id. See also* "Former Boeing Engineers Say Relentless Cost-Cutting Sacrificed Safety," *Bloomberg News*, May 8, 2019, available at https://www.bloomberg.com/news/features/2019-05-09/former-boeing-engineers-say-relentless-cost-cutting-sacrificed-safety ("Since the crashes of two Maxes within five months . . . the pressure and maneuvering around simulator training has struck Ludtke as essential to understanding how an emphasis on costs twisted a process that's supposed to produce the best, safest planes. 'They could have done better and should have done better, but better wasn't an option'"); "Head of pilots union points to training and engineering mistakes with Boeing 737 Max," *The Washington Post*, June 18, 2019, available at https://www.washingtonpost.com/local/trafficandcommuting/head-of-pilots-union-points-to-training-and-engineering-mistakes-with-737-max/2019/06/17/4bbc9abc-9156-11e9-b570-6416efdc0803_story.html?utm_term=.593b5eef20c4 (quoting testimony from Daniel Carey, Allied Pilots Association President, that "The point was to provide Boeing's customers with a new advanced aircraft while minimizing the training cost associated with a different aircraft certification.").

started to speculate and wonder whether it was safe to do MAX.'"[53]

90.     "He said that if the group had built the MCAS in a way that would depend on two sensors, and would shut the system off if one fails, he thinks the company would have needed to install an alert in the cockpit to make the pilots aware that the safety system was off.  And if that happened, Ludtke said, the pilots would potentially need training on the new alert and the underlying system.  That could mean simulator time, which was off the table."[54]

91.     Ludtke told *The Seattle Times*, "The decision path they made with MCAS is probably the wrong one.  It shows how the airplane is a bridge too far."[55]

92.     One former Boeing engineer who worked on the 737 MAX, requesting anonymity to speak frankly about the program to *The Seattle Times*, said with respect to the sensor design that "[a] single point of failure is an absolute no-no.  That is just a huge system engineering oversight.  To just have missed it, I can't imagine how."[56]

93.     "Peter Seiler, a professor at the University of Minnesota who previously worked on flight-control electronics for the Boeing 787 aircraft, said it would be highly unusual to have a safety-critical system dependent on a single sensor". He explained, "It's a huge part of the design. It's a huge part of the certification process."[57]

---

[53] "Lack of redundancies on Boeing 737 MAX system baffles some involved in developing the jet," *The Seattle Times*, March 26, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/a-lack-of-redundancies-on-737-max-system-has-baffled-even-those-who-worked-on-the-jet/.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

94.     "Andrew Kornecki, a former professor at Embry-Riddle Aeronautical University who has studied redundancy systems in Airbus and Boeing planes," said to *The Seattle Times* that "operating the automated system with one or two sensors would be fine if all the pilots were sufficiently trained in how to assess and handle the plane in the event of a problem.  But, he said, if he were designing a system from scratch, he would emphasize the training while also building the plane with three sensors. 'As they say: belt and suspenders,' Kornecki said."[58]

95.     As expressed by these Boeing engineers and experts in the field, the basic design of the 737 MAX is unstable, resulting in it being prone to stall.  Defendants knew or should have known about design flaws, as described above.

**B. The First Crash, Lion Air Flight 610[59]**

96.     On October 29, 2018, Lion Air Flight 610 (the "Indonesian Flight") was a scheduled domestic flight operated by the Indonesian airline Lion Air from Soekarno-Hatta International Airport in Jakarta, Indonesia with intended destination Depati Amir Airport in Pangkal Pinang, Indonesia.

97.     Minutes after takeoff, the Boeing 737 MAX 8 (the "Lion Air Jet") operating the route crashed into the Java Sea, killing all 188 passengers and crew (the "First Crash").

98.     The data retrieved from the black box data recorder after the First Crash indicates that a single faulty sensor—a vane on the outside of the fuselage that measures the plane's angle-of-attack—triggered MCAS multiple times during the flight, initiating a tug of war as the system

---

[58] *Id.*

[59] *See* "Findings" of the October 29, 2018 Preliminary Report published by the Komite National Keselamatan Transportasi (KNKT). *See also* "Pilots struggled against Boeing's 737 MAX control system on doomed Lion Air flight," *The Seattle Times*, November 28, 2018, available at https://www.seattletimes.com/business/boeing-aerospace/black-box-data-reveals-lion-air-pilots-struggle-against-boeings-737-max-flight-control-system/

repeatedly pushed the nose of the plane down and the pilots wrestled with the controls to pull it back up, before the final crash.

99.     The Digital Flight Data Recorder recorded a difference between left and right angle-of-attack of about 20 degrees in their measurements throughout the flight, even during the ground taxi phase when the plane's pitch was level. The disagreement between the sensors continued until the end of the flight.[60]

100.    The MCAS anti-stall system was triggered as soon as the wing flaps retracted.[61]

101.    When the MCAS system pushed the nose down, the pilot repeatedly pulled it back up.[62]

102.    Each time the pilot pulled it up, the MCAS system, as designed by Boeing, swiveled the horizontal tail of the plane and pushed the nose back down again.[63]

103.    The data shows that after this cycle repeated 21 times, the captain ceded control to the first officer and MCAS then pushed the nose down twice more, this time without a response from the pilot.[64]

104.    After a few more cycles of this struggle, with the horizontal tail now close to the limit of its movement, the captain resumed control and pulled back on the control column with high force before the plane crashed into the sea.[65]

105.    According to Indonesian safety regulators, the Lion Air Jet that crashed into the Java Sea was unfit to fly on more than one occasion in the days leading up to its final flight.

---

[60] *Id.*
[61] *Id.*
[62] *Id*.
[63] *Id.*
[64] *Id*.
[65] *Id*.

106.     The Preliminary Report published by the Indonesian National Transportation Safety Committee (the "Komite National Keselamatan Transportasi" or "KNKT") focuses on Lion Air's maintenance practices as well as its anti-stall systems in the aircraft. As the Report notes, the Lion Air Jet's maintenance logs reported problems with airspeed and altitude readings on four of the six flights operating during the three days prior to the crash.

107.     On October 28, 2018, the day before the crash, the Lion Air Jet was operated as a scheduled passenger flight from Denpasar to Jakarta ("the Denpsar-Jakarta Flight"). Prior to the flight, the angle-of-attack sensor had been replaced and tested.[66]

108.     As occurred on the Indonesian Flight, the angle-of-attack sensors were in disagreement from the start of the Despasar-Jakarta Flight.[67]

109.     After a similar tug-of-war ensued with about a dozen cycles of the nose going down and pushing back up, a third pilot, who had been riding in the jumpseat in the cockpit, turned the MCAS off using the standard cutoff switches.[68]

110.     There were no further nose-down movements and for the rest of the Denpasar-Jakarta Flight, the pilots safely controlled the pitch of the aircraft manually to their destination.[69]

111.     On the Lion Air Jet's second-to-last flight, from Bali to Jakarta (the "Bali-Jakarta Flight"), the problems were serious enough that crew reported a "stick shaker activation", which

---

[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*

29

warns of a stall.

112.    The original Boeing document provided to the FAA included a description specifying a limit to how much the system could move the horizontal tail—0.6 degrees, out of a physical maximum of just less than 5 degrees of nose-down movement.[70]

113.    That limit was later increased after flight tests showed that a more powerful movement of the tail was required to avert a high-speed stall, when the plane is in danger of losing lift and spiraling down.[71]

114.    Only after the First Crash did Boeing for the first time provide details to airlines about MCAS's command being 2.5 degrees.[72]

115.    That 2.5 degrees number was new to FAA engineers who had seen 0.6 degrees in the safety assessment.[73]

116.    "The FAA believed the airplane was designed to the 0.6 limit, and that's what the foreign regulatory authorities thought, too," an FAA engineer told *The Seattle Times*.  "It makes a difference in your assessment of the hazard involved."[74]

117.    Even Boeing test pilots for the 737 MAX were not informed of the rate of movement on MCAS.  One such Boeing test pilot, Matthew Menza, said, "Therein lies the issue

---

[70] "Flawed Analysis, Failed Oversight: How Boeing, FAA certified the suspect 737 MAX control system," *The Seattle Times*, March 17, 2019, available at
https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash
[71] *Id*.
[72] *Id*.
[73] *Id*.
[74] *Id*.

with the design change. Those pitch rates were never articulated to us." [75]

118.    Menza said that, after the First Crash, he looked at the documentation and did not see mention of the rate of movement on MCAS. He said, "So they certainly didn't mention anything about pitch rates to us, and I certainly would've loved to have known."[76]

119.    Dennis Tajer, a spokesman for the American Airlines pilots union, who has flown 737s for a decade, said, "That's a huge difference. That's the difference between controlled flight or not."[77]

120.    *The Seattle Times* reported that the safety systems analysis concluded that a faulty activation of the MCAS under extreme flight conditions would be a "hazardous failure"— meaning it could cause serious or fatal injuries to passengers. The analysis stopped short of the "catastrophic failure" classification that predicts a total loss and many deaths.[78]

121.    Had the FAA known of the increased limit of 2.5 degrees on the jet's horizontal tail it might have changed the FAA's conclusions on certification or the severity of hazard assessment involved, because each time MCAS was triggered, it caused a much greater movement of the tail than was specified in that original safety analysis document.[79]

---

[75] "Changes to Flight Software on 737 MAX Escaped F.A.A. scrutiny," *The New York Times*, April 11, 2019, available at  https://www.nytimes.com/2019/04/11/business/boeing-faa-mcas.html

[76] *Id.*

[77] *Id*.

[78] "Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system," *The Seattle Times*, March 17, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/

[79] *Id*.

122.     The hazard stemming from the increased limit of 2.5 degrees on the jet's horizontal tail resulting in nose down movement was increased by another flaw in the MCAS's command system, in that every time the pilots on the Indonesian Flight reset the switches on their control columns to pull the nose back up, MCAS would have kicked in again and allowed new increments of 2.5 degrees.  Once the pilots pushed a couple of times, they were at full stop, meaning at the full extent of the tail swivel.[80]

123.     Swiveling the horizontal tail (technically known as the stabilizer) to the end stop gives the airplane's nose the maximum possible push downward.[81]

124.     Peter Lemme, a former Boeing flight controls engineer who is now an avionics and satellite-communications consultant, said "It [MCAS] had full authority to move the stabilizer the full amount.  There was no need for that.  Nobody should have agreed to giving it unlimited authority."[82]

125.     Chesley B. Sullenberger, III, the retired pilot who landed a jet in the Hudson River, said: "In creating MCAS they violated the longstanding principle at Boeing to always have pilots ultimately in control of the aircraft. In mitigating one risk they created another, greater risk."[83]

_____

[80] *Id*.
[81] *Id*.
[82] *Id.*
[83] "Changes to Flight Software on 737 Max Escaped F.A.A. Scrutiny," *The New York Times*, April 11, 2019, available at https://www.nytimes.com/2019/04/11/business/boeing-faa-mcas.html.  *See also* Mr. Sullenberger's testimony to the U.S. House of Representatives aviation subcommittee described in "Pilots criticize Boeing for mistakes on its grounded jet," *The Seattle Times*, June 18, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/lawmakers-will-hear-from-pilots-who-have-criticized-boeing/

126.    On the Indonesian Flight, when the MCAS pushed the jet's nose down, the captain pulled it back, using thumb switches on the control column. Still operating under the false angel-of-attack reading, MCAS kicked in each time to swivel the horizontal tail and push the nose down again.[84]

127.    The flight recorder data released in the preliminary investigation report shows that after this cycle repeated 21 times, the plane's captain ceded control to the first officer. As MCAS pushed the nose down two or three times more, the first officer responded with only two short flicks of the thumb switches.[85]

128.    At a limit of 2.5 degrees, two cycles of MCAS correction would have been enough to reach the maximum nose-down effect.[86]

129.    In the final second, the flight recorder shows the captain resumed control and pulled back up with high force. But it was too late. The plane dived into the sea at more than 500 miles per hour.[87]

130.    Most new Boeing jets have electronic systems that take pilots through their

---

[84] "Pilots struggled against Boeing's 737 Max control system on doomed Lion Air flight," *The Seattle Times*, November 27, 2018, available at https://www.seattletimes.com/business/boeing-aerospace/black-box-data-reveals-lion-air-pilots-struggle-against-boeings-737-max-flight-control-system/
[85] *Id.*
[86] "Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system," *The Seattle Times*, March 17, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/
[87] "Pilots struggled against Boeing's 737 Max control system on doomed Lion Air flight," *The Seattle Times*, November 27, 2018, available at https://www.seattletimes.com/business/boeing-aerospace/black-box-data-reveals-lion-air-pilots-struggle-against-boeings-737-max-flight-control-system/

preflight checklists, ensuring they do not skip a step and potentially miss a malfunctioning part. On 737 MAX jets, pilots still complete those checklists manually, from a book.[88]

131.    A second electronic system found on other Boeing jets also alerts pilots to unusual or hazardous situations during flight and lays out recommended steps to resolve them. But on 737 MAX jets, a light typically indicates the problem and pilots have to flip through their paper manuals to find next steps.[89]

132.    As the Indonesian Flight pilots struggled with MCAS for control of the plane, the pilots consulted the manual in the moments before the jet crashed.[90]

133.    *The New York Times* reported that Boeing decided against adding the electronic safety system that pops up on the screen and identifies a recommended checklist of potential solutions, "because it could have prompted regulators to require new pilot training, according to two former Boeing employees involved in the decision."[91]

134.    In November 2018, a Boeing 737 MAX pilot made a report in the ASRS that there was an autopilot issue with the aircraft, which led to the aircraft's nose pitching down:

> Wind and mechanical turbulence was noted. Careful engine warm times, normal flaps 5 takeoff in strong (appeared almost direct) crosswind. Departure was normal. Takeoff and climb in light to moderate turbulence. After flaps 1 to "up" and above clean "MASI up speed" with LNAV engaged I looked at and engaged A Autopilot. As I was returning to my PFD (Primary Flight Display) PM (Pilot Monitoring) called "DESCENDING" followed by almost an immediate: "DON'T SINK

---

[88] "Boeing's 737 Max: 1960s Design, 1990s Computing Power and Paper Manuals," *The New York Times*, April 8, 2019, available at
 https://www.nytimes.com/2019/04/08/business/boeing-737-max-.html
[89] *Id.*
[90] *Id.*
[91] *Id.*

DON'T SINK!"[92]

135.    On January 8, 2019, Defendants issued a press release entitled, "Boeing Sets New Airplane Delivery Records, Expands Order Backlog, Delivered 806 commercial jets in 2018 with record-setting fourth quarter, Won nearly 900 net orders valued at $143.7 billion after finalizing more than 200 orders in December, 737 MAX family surpassed 5,000 orders; 777 family exceeded 2,000 orders." The press release stated, among other things:

> "Boeing raised the bar again in 2018 thanks to our teammates' incredible focus on meeting customer commitments, and continuously improving quality and productivity," said Boeing Commercial Airplanes President & CEO Kevin McAllister. "In a dynamic year, our production discipline and our supplier partners helped us build and deliver more airplanes than ever before to satisfy the strong demand for air travel across the globe."
>
> **With a seven-year order backlog, Boeing increased production of the popular 737 in the middle of 2018 to 52 airplanes per month. Nearly half of the year's 580 737 deliveries were from the more fuel-efficient and longer-range MAX family, including the first MAX 9 airplanes.**
>
> ***
>
> The 737 MAX family also achieved a major sales milestone in December, surpassing 5,000 net orders with 181 new sales during December. For the full year, the 737 program achieved 675 net orders, including sales to 13 new customers.
>
> "We are honored that customers around the world continued to vote for the unmatched capabilities of Boeing's airplane and services portfolio. **In addition to the ongoing demand for the 737 MAX**, we saw strong sales for every one of our twin-aisle airplanes in a ringing endorsement of their market-leading performance and efficiency," said Ihssane Mounir, senior vice president of Commercial Sales & Marketing for The Boeing Company.
>
> "More broadly, another year of healthy jet orders continues to support our long-term forecast for robust global demand that will see the commercial airplane fleet double in 20 years," said Mounir.

---

[92] "Here's what was on record about problems with the 737 MAX," *The Atlantic*, March 13, 2019, available at https://www.theatlantic.com/notes/2019/03/heres-what-was-on-the-record-about-problems-with-the-737-max/584791/

136. This news drove the price of Boeing shares up from $328.11 to $340.53 or $12.42, and about 3.8% that day.

137. On January 14, 2019, Defendants issued a press release entitled, "Boeing statement on the recovery of the Cockpit Voice Recorder for Lion Air Flight 610." The press release stated, among other things:

> Boeing appreciates the hard work of the investigation team to locate the cockpit voice recorder (CVR) of Lion Air Flight 610.
>
> The CVR records radio transmissions and sounds in the cockpit, such as the pilots' voices, audible alerts and aircraft/engine noise.
>
> **Boeing is taking every measure to fully support this investigation. As the investigation continues, Boeing is working closely with the U.S. National Transportation Safety Board as a technical advisor to support Indonesia's National Transportation Safety Committee (NTSC).**
>
> In accordance with international protocol, all inquiries about the ongoing accident investigation must be directed to the NTSC.

138. On January 16, 2019, Defendants issued a press release entitled, "Boeing, United Airlines Announce Repeat Orders for 737 MAX and 777." The press release stated, among other things:

> SEATTLE, WA Jan 16, 2019 – Boeing [NYSE: BA] and United Airlines [NASDAQ: UAL] **announced the carrier ordered 24 additional 737 MAX jets** and four more 777-300ER (Extended Range) airplanes last year. The $4.5 billion order, according to list prices, was booked as unidentified on Boeing's Orders & Deliveries website.
>
> The Chicago-based airline has steadily placed new orders for the two Boeing jets to serve its large domestic and international network. **United Airlines is among the more than 100 customers who have made the 737 MAX the fastest-selling airplane in Boeing history, receiving more than 5,000 orders since the program's launch**.
>
> "United Airlines has been **instrumental to the phenomenal success of the Boeing 737** and 777 programs over the years. We are honored by United's continued confidence in our people and our airplanes and services," said

36

Ihssane Mounir, senior vice president of Commercial Sales & Marketing for The Boeing Company. "We are proud to again extend our long-standing partnership with United Airlines with these latest orders."

**The MAX builds on the 737's industry-leading performance and reliability** by offering operators more range and 14-percent better fuel efficiency compared to today's airplanes and 20 percent more than the airplanes it replaces. **The MAX achieves the improved performance thanks to the CFM International LEAP-1B engines, Advanced Technology winglets, and other airframe enhancements**.

139. On January 30, 2019, Defendants issued a press release entitled, "Boeing Reports Record 2018 Results and Provides 2019 Guidance." The press release stated, among other things:

Our One Boeing focus, clear strategies for growth, and leading positions in large and growing markets, give us confidence for continued strong performance, revenue expansion and solid execution across all three businesses, which is reflected in our 2019 guidance.

**We remain focused on** executing on our production and development programs as well as our growth strategy while driving further productivity, **quality and safety improvements**, investing in our team and creating more value and opportunity for our customers, shareholders and employees.

\*\*\*

During the quarter, Commercial Airplanes delivered 238 airplanes, including the delivery of the 787th 787 Dreamliner and the first 737 MAX Boeing Business Jet. **The 737 program delivered 111 MAX airplanes in the fourth quarter, including the first MAX delivery from the China Completion Center, and delivered 256 MAX airplanes in 2018**.

140. This news drove the price of Boeing shares up from $364.91 to $387.72 or $22.81, and about 6.25% that day.

141. On February 8, 2019, Defendants filed Boeing's FY 2018 annual report on Form 10-K. Muilenburg and Smith certified the annual report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances which such statements were made, not misleading. Within it, Defendants stated, among other things:

37

**We are focused on improving our processes** and continuing cost reduction efforts.

We intend to continue to compete with other airplane manufacturers by **providing customers with greater value products**.

In the U.S., **our commercial aircraft products are required to comply with FAA regulations governing production and quality systems, airworthiness** and installation approvals, repair procedures and continuing **operational safety**. Outside the U.S., similar requirements exist for airworthiness, installation and operational approvals. These requirements are generally administered by the national aviation authorities of each country and, in the case of Europe, coordinated by the European Joint Aviation Authorities.

We focus on producing the products and providing the services that the market demands, and continue to find new ways to improve efficiency and quality to provide a fair return for our shareholders. BCA is committed to being the leader in commercial aviation by **offering airplanes and services that deliver superior design**, efficiency and value to customers around the world.

142.     On February 20, 2019, Muilenburg participated in the Barclays Industrial Select

Conference. There, he discussed the 737 MAX in part as follows:

If you take a look at our guidance for 2019, you'll see reflects that expectation's strong, continued top and bottom line growth. If we take a look at sort of the quarterly profile for this year, we expect first quarter to be the lightest quarter of the year as it always is from a seasonality standpoint.

So you'll see that as the lowest revenue, lowest delivery quarter of the year. We expect to see about 20% of our annual earnings in the first quarter and probably about 10% to 15% of our annual cash flow in the first quarter, just to give you a sense of the profile. **And then the other key thing to keep an eye on is our Boeing 737 MAX deliveries. We're continuing to ramp up, we're making progress on our recent supply chain challenges**. We are still planning to move that line from 52 a month to 57 a month this year.

But again in the first quarter, you'll see that Boeing 737 MAX deliveries will be back loaded in the quarter, some of that's normal seasonality, some weather challenges early in the year and it also reflects our supply chain recovery plans.

All of that said, **we do expect Boeing 737 MAX to continue to ramp up successfully** and overall commercial deliveries this year, going from 806 deliveries last year to as we guided roughly 900 commercial airplane deliveries this year. So, all of that is fueling top and bottom line growth.

143.     This news drove the price of Boeing shares up $5.29, or about 1.3% on February

20, 2019, to close at $ 421.55.

144.     On February 27, 2019, Defendants issued a press release entitled, "Boeing, Vietjet

Announce Order for 100 737 MAX Airplanes." The press release stated, among other things:

HANOI, Vietnam, Feb. 27, 2019 /PRNewswire/ – **Boeing [NYSE: BA] and Vietjet [HOSE: VJC] confirmed that the innovative and growing Vietnamese carrier has purchased 100 additional 737 MAX airplanes, taking their MAX order book to 200 jets.** During a signing ceremony today in Hanoi, United States President Donald Trump and Vietnamese Communist Party General Secretary and President Nguyen Phu Trong joined leaders of both companies to unveil the $12.7 billion order, according to list prices.

**The deal includes 20 MAX 8s and 80 of the new, larger MAX 10 variant, which will have the lowest seat-mile costs for a single aisle airplane and be the most profitable jet in its market segment.** The order was previously unidentified on Boeing's Orders & Deliveries website.

In ordering 80 MAX 10s, Vietjet becomes the largest Asian customer of the airplane type. The carrier plans to use the added capacity to meet growing demand across Vietnam, as well as to serve popular destinations throughout Asia.

**"The deal for 200 Boeing 737 MAX airplanes today is an important move for us to keep up with our international flight network expansion plan with a higher capacity, thus offering our passengers with more exciting experiences when being able to fly to more new international destinations,"** said Madam Nguyễn Thị Phương Thảo, President and CEO of Vietjet. "I believe that our fleet will have breakthroughs thanks to new-generation technologies, which helps improve flight quality and enhance operational reliability, while reducing operating costs in the future. Passengers will then have more opportunities to fly with reasonable fares. The contract signing ceremony, which is witnessed by the top leaders of Vietnam and the US on the occasion of the US-North Korea Summit in Hanoi, will mark a milestone in the two companies' growth path."

Vietjet placed its first order for 100 737 MAX airplanes in 2016, which set

the mark for the largest commercial jet purchase in Vietnam's aviation sector at the time.

"We are pleased to expand our partnership with Vietjet **and to support their impressive growth with new, advanced airplanes such as the 737 MAX. We are confident the MAX will help Vietjet grow more efficiently and provide great travel experiences for their passengers," said Boeing Commercial Airplanes President & CEO Kevin McAllister.** "The economic expansion in Hanoi and across Vietnam is impressive. Vietjet and the country's burgeoning aviation sector are clearly enablers, helping to stimulate travel within Vietnam and connecting Vietnam with the rest of Asia. We are proud to support this economic development, which in turn supports engineering and manufacturing jobs in the United States."

In addition to airplane purchases, Boeing will partner with Vietjet to enhance technical and engineering expertise, train pilots and technicians, and improve management capabilities at the airline and in Vietnam.

The carrier also uses Boeing's digital solutions to optimize its operations, including flight planning & Tech Log Book.

**About the 737 MAX**

**The 737 MAX family is powered by CFM International LEAP-1B engines, and includes design updates such as Boeing's Advanced Technology winglet that reduces drag and further optimizes the 737 MAX performance, especially on longrange missions. Together, these improvements reduce fuel use and $CO_2$ emissions by at least 14 percent compared to today's Next-Generation 737s – and by 20 percent more than the single aisle airplanes they replace.**

The 737 MAX 10 is the largest variant in the family. At 43.8 meters (143 feet 8 inches) long, the airplane can seat a maximum of 230 passengers and offer airlines the lowest seat-mile costs in the single aisle market.

The 737 MAX is the fastest-selling airplane in Boeing history with about 5,000 orders from more than 100 customers worldwide.

145.    Defendants' statements were materially false and misleading and/or omitted

material information that a reasonable investor, including Plan participants, would consider

important and/or lacked a reasonable basis because, contrary to such statements, Defendants knew

and concealed the fact that (1) the 737 MAX airplanes were in fact so less safe than previous

40

models that they included undisclosed "hacks" in an attempt to overcome these safety concerns created by engineering compromises, lacked safety features which Boeing sold as "optional" add-ons which were designed to help address these safety concerns, (2) that most airlines did not purchase these safety "options", and (3) that the FAA handed oversight and certification of Boeing's MCAS to Boeing, which had a clear conflict of interest as it was rushing the 737 MAX to market.

### C. The Second Crash, Ethiopian Airlines Flight 302

146. On March 10, 2019, the Ethiopian Flight 302 (the "Ethiopian Flight"), took off from Addis Ababa Bole International Airport in Ethiopia bound to Nairobi, Kenya, Jomo Kenyatta International Airport.[93]

147. Shortly after takeoff, the angle-of-attack sensor of the Boeing 737 MAX 8 operating the route (the "Ethiopian Airlines Jet")[94] recorded an erroneous value and the left stick shaker activated and remained active until near the end of the flight. In addition, the airspeed and altitude values from the left air data system began deviating from the corresponding right side values.[95]

---

[93] "Ethiopian pilots fought the Boeing 737 MAX flight controls almost from takeoff, preliminary report shows," *The Seattle Times*, April 4, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/preliminary-crash-report-reveals-detail-of-ethiopian-pilots-fight-against-the-737-max-flight-controls/
[94] The aircraft had been manufactured by Boeing in 2018 and delivered new to Ethiopian Airlines in November of 2018.
[95] "Ethiopian pilots fought the Boeing 737 MAX flight controls almost from takeoff, preliminary report shows," *The Seattle Times*, April 4, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/preliminary-crash-report-reveals-detail-of-ethiopian-pilots-fight-against-the-737-max-flight-controls/

148.    Due to flight control problems, the Captain was unable to maintain the flight path and requested to return back to the departure airport.[96]

149.    According to the preliminary investigation, the pilots began the tug-of-war with MCAS barely a minute after leaving the ground, after there was a disagreement between the left and right sensors on the Ethiopian Airlines Jet.[97]

150.    At about the 2-minute mark of the Ethiopian Flight, when the pilot retracted the flaps and turned off the autopilot, the faulty sensor activated MCAS, which pushed the nose of the jet down three times.[98]

151.    The pilots then hit the cutoff switches, turning MCAS off.  After the MCAS is shut off though, the pilots are not able to manually pull the nose up.[99]

152.    Once the power was cut, the pilots tried to regain control manually by turning a wheel next to their seat.  The 737 is the last modern Boeing jet that uses a manual wheel as its backup system of cables and pulleys that, when pilots pull back on the controls, transfer movement to the tail.[100]

153.    Boeing has long known that turning the wheel is difficult at high speeds, and may have required two pilots to work together.[101]

_____

[96] *Id*.
[97] *Id*.
[98] *Id*.
[99] *Id*.
[100] "Boeing's 737 Max: 1960s Design, 1990s Computer Power and Paper Manuals," *The New York Times*, April 8, 2019, available at https://www.nytimes.com/2019/04/08/business/boeing-737-max-.html
[101] *Id*.

154. In the final moments of the Ethiopian Flight, the first officer said the method was not working according to the preliminary crash report.

155. At the 5:43 minute mark, the pilots turned the cut-off switches back on, providing them electrical power to move the tail and make two quick nose-up movements, but the MCAS moved the nose down again.[102]

156. The Ethiopian Airlines Jet crashed to the ground six minutes after takeoff South East of Addis Ababa near Ejere village, killing all 157 passengers and crew on board and destroying the aircraft[103] (the "Second Crash").

157. On March 17, 2019, *The Seattle Times* released an investigative report revealing in part (a) "the original safety analysis that Boeing delivered to the FAA for a new flight control system on the MAX had several crucial flaws," (b) "the FAA . . . has over the years delegated increasing authority to Boeing to take on more of the work certifying the safety of its own airplanes," and (c) "the System Safety Analysis on MCAS, just one piece of the mountain of documents needed for certification, was delegated to Boeing."

158. On March 18, 2019, *Bloomberg* reported U.S. federal authorities began exploring a criminal investigation of how Boeing's 737 MAX was certified to fly passengers before the Ethiopian crash.

159. Following *The Seattle Times* and *Bloomberg* reports, the price of Boeing shares fell $6.71 to close at $ 372.28 on March 18, 2019.

160. On March 21, 2019, *The New York Times* reported in an article entitled, "Doomed Boeing Jets Lacked 2 Safety Features That Company Sold Only as Extras", that Boeing has

---

[102] *Id.*
[103] *Id.*

hidden from investors, pilots and passengers, that because of the safety compromised, Boeing created two new safety features that it sold as "extras" or "optional features" to keep cost down. This news drove the price of Boeing shares down $10.53, or down about 3%, to close at $362.17 on March 22, 2019.

161. In a brief summary of the preliminary report on the Second Crash, Ethiopia's transport minister Dasmawit Moses told reporters that the "aircraft flight-control system" contributed to the difficulty in gaining altitude from Addis Ababa airport before crashing six minutes later.[104]

162. She said the crew "performed all the procedures, repeatedly, provided by the manufacturer but was not able to control the aircraft."[105]

163. She further said, "[s]ome repetitive uncommanded aircraft nose-down conditions were noticed. In this preliminary investigation, it is recommended that the aircraft flight-control system related to flight control-ability be reviewed by the manufacturer."[106]

164. Moses later confirmed that the MCAS had been active during the flight.[107]

165. Ethiopian Airlines said after Moses's conference, that the preliminary report absolves the pilots, who "followed the Boeing recommended and FAA-approved emergency

---

[104] "Crash report says Ethiopian pilots performed Boeing's recommendations to stop doomed aircraft from diving," *The Washington Post*, April 4, 2019, available at https://www.washingtonpost.com/world/africa/ethiopia-says-pilots-performed-boeings-recommendations-to-stop-doomed-aircraft-from-diving-urges-review-of-737-max-flight-control-system/2019/04/04/3a125942-4fec-11e9-bdb7-44f948cc0605_story.html
[105] *Id.*
[106] *Id.*
[107] *Id.*

procedures." The airline further stated, "Despite their hard work and full compliance with the emergency procedures, it was very unfortunate that they could not recover the airplane from the persistence of nose diving."[108]

166.    That suggests the emergency procedure laid out by Boeing and passed along by the FAA after the First Crash is wholly inadequate and failed the Ethiopian Flight crew, as illustrated in the graphic below.[109]



167.    Peter Lemme, the former Boeing flight-controls engineer who is now an avionics and satellite-communications consultant, did a detailed analysis of the First Crash.  Lemme has been extensively cited as an expert in *The Seattle Times* and subsequently in multiple press

---

[108] *Id.*
[109] "Why Boeing's emergency directions may have failed to save 737 MAX," *The Seattle Times*, April 3 2019, available at https://www.seattletimes.com/business/boeing-aerospace/boeings-emergency-procedure-for-737-max-may-have-failed-on-ethiopian-flight/

accounts including *The New York Times*. On April 1, 2019, Lemme was served a subpoena to provide documents and appear in person before the grand jury in Washington, D.C. on April 12, 2019.[110]

168.    The U.S. Transportation Department has begun an inquiry into how the MCAS was approved as part of the 737 MAX's certification in 2017, while the Justice Department is using a grand jury to gather information.[111]

169.    Lemme explained to *The Seattle Times* how Boeing's bulletin on the emergency procedure could have failed the Ethiopian Flight pilots. He believes the pilots were not able to carry out the last instruction in the procedure, because they could not physically move the wheel against the heavy forces acting on the tail. "The forces on the tail could have been too great," Lemme said. "They couldn't turn the trim wheel."[112]

170.    The stabilizer in the Ethiopian Airlines Jet could have been in an extreme position with two separate forces acting on it:

- MCAS had swiveled the stabilizer upward by turning a large mechanical screw inside the tail called the jackscrew. This is pushing the jet's nose down. But the pilot had pulled his control column far back in an attempt to counter, which would flip up a separate moveable surface called the elevator on the trailing edge of the tail.
- The elevator and the stabilizer normally work together to minimize the loads on the jackscrew. But in certain conditions, the elevator and stabilizer loads

---

[110] "Grand jury subpoena shows sweep of criminal probe into Boeing's 737 MAX certification," *The Seattle Times*, April 2, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/grand-jury-subpoena-shows-sweep-of-criminal-probe-into-boeings-737-max-certification/

[111] "Ethiopia Wavers on Timing of Report on Boeing 737 Max Jet Crash," *The Seattle Times*, April 1, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/preliminary-report-due-today-on-737-max-crash-in-ethiopia/

[112] *Id.*

combine to present higher forces on the jackscrew and make it difficult to turn manually.[113]

171.    As the jet's airspeed increases with the nose down, it will accelerate and these forces grow even stronger.[114]

172.    In this scenario, the air flow pushing downward against the elevator would have created an equal and opposite load on the jackscrew, a force tending to hold the stabilizer in its upward displacement.  This heavy force would resist the pilot's manual effort to swivel the stabilizer back down.[115]

173.    This analysis suggests the stabilizer trim wheel at the Ethiopian Flight captain's right hand could have been difficult to budge.  As a result, the pilots would have struggled to get the nose up and the plane to climb.[116]

174.    If, after much physical exertion failed, the pilots gave up their manual strategy and switched the electric trim system back on—as indicated in the preliminary reports on the Ethiopian Flight—MCAS would have begun pushing the nose down again.[117]

175.    A separate analysis done by Bjorn Fehrm, a former jet-fighter pilot and an aeronautical engineer who is now an analyst with Leeham.net, replicated Lemme's conclusion that excessive forces on the stabilizer trim wheel led the pilots to lose control.

176.    Earlier Boeing pilot manuals contained more detailed instructions for addressing conditions leading to the manual stabilizer wheel to seize up at high air speed.  These instructions are provided in the 1982 pilot manual for the old 737 and earlier models.

---

[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*

177.    These instructions are no longer in the pilot manuals for the MAX jets.

**D. Additional Similarities in the First and Second Crashes**

178.    Officials with France's Bureau D'Enquetes et D'Analyses (BEA) found that data from the flight records of the Ethiopian Flight showed "clear similarities" with the Indonesian Flight.[118]

179.    The FAA in announcing the grounding of the 737 MAX also cited similarities in the flight trajectory of the Indonesian Flight and Ethiopian Flight.

180.    The FAA cited satellite tracking data as a key similarity. The planes ascended and descended multiple times before crashing.[119]

181.    The undisclosed MCAS software essentially took control from the pilots over the 737 MAX jets they were filing.

182.    Investigators also found the Ethiopian Airlines Jet's jackscrew, a part that moves the horizontal tail of the aircraft and is used to set the device to raise and lower the plane's nose. This discovery indicated that the jet's horizontal tail was in an unusual position, with MCAS as one possible reason.

183.    Both flights also departed from airports in the "high/hot" category. Heat, air density and fast speed have not been cited as factors in the preliminary accident reports, but

---

[118] "Federal investigators looking into Boeing 737 MAX following 2 crashes in less than five months," *The Washington Post*, March 18, 2019, available at https://www.washingtonpost.com/local/trafficandcommuting/federal-investigators-looking-into-boeing-737-max-following-2-crashes-in-less-than-five-months/2019/03/18/bcd94740-4999-11e9-9663-00ac73f49662_story.html?noredirect=on&utm_term=.044e96709a1c
[119] *Id.*

performance of all airplanes deteriorate in high heat or elevation. High elevations also require longer runways and faster speeds for takeoff.

184. As alleged above, at least by 2017, Boeing and its legal department knew that the Boeing 737 MAX jets were not suitable for airports at high altitudes or with hot conditions.[120]

185. The Ethiopian Airlines Jet took off in Ethiopia at an elevation of 7,657 feet—or more than a mile high. With this elevation, the Addis Ababa Bole International Airport falls into the "high/hot" category.

186. Soekamo-Hatta International Airport in Jakarta, from which the doomed Lion Air Jet took off, is also considered a "hot air field" which "produce[s] similar air densities as high elevations, requiring faster takeoff speeds."[121]

187. A Los Angeles Times article quotes a 737 pilot who flies into high-elevation airports, saying that the Ethiopian airport's altitude "could have exacerbated the situation because an airplane's performance degrades at higher altitudes."[122]

188. According to *The Seattle Times*, aviation safety consultant John Cox, Chief Executive of Safety and Operating Systems and formerly the top safety official for the Air Line Pilots Association, explained that in the 737 models that followed the -200, what was called a

---

[120] *See* U.S. International Trade Commission Determination, February 2018, Investigation Nos. 701-TA-578 and 731-TA-1368.
[121] "Boeing has called its 737 Max 8 'not suitable' for certain airports," *Los Angeles Times*, April 11, 2019, available at https://www.latimes.com/business/la-fi-boeing-max-8-airports-20190411-story.html
[122] *Id.*

49

"runaway stabilizer" ceased to be a problem. The introduction of MCAS in the 737 MAX, however, creates a condition similar to a runaway stabilizer, so potential for the manual stabilizer wheel to seize up at high airspeed has returned.

### E. Boeing's Reaction to the Two Crashes

189.    Following the Second Crash, a worldwide grounding of the planes by regulators, a stock slide, and the loss of a multibillion-dollar contract, Boeing is taking a new approach.[123] The company invited hundreds of pilots and airline partners to its Renton, Washington assembly facility on March 27, 2019, in a hastily arranged meeting in order to explain new safety enhancements.[124] Boeing continued to defend the safety of its planes and deflect claims that its automation software may have contributed to the First Crash or Second Crash.[125]

190.    Eventually, Boeing acknowledged that in the First and Second Crashes, a faulty sensor triggered an anti-stall system when it was not needed, pushing the planes' nose down. Pilots on the Indonesian Flight and Ethiopian Flight fought unsuccessfully to regain control, according to the flight data retrieved from the planes, as discussed above.

191.    Boeing's Chairman, President and CEO, Dennis Muilenberg, wrote a letter of apology made public on the company's website on April 4, 2019. In pertinent part, he stated:

> The history of our industry shows most accidents are caused by a chain of events. This again is the case here, and we know we can break on of those chain links in the two accidents. **As pilots have told us, erroneous action of the MCAS function can add to what is already a high workload environment. It's our responsibility to eliminate this risk. It's our responsibility to eliminate this risk. It's our responsibility to eliminate this risk. It's our responsibility to eliminate this risk. It's our responsibility to eliminate this risk. We own it and we know how to do it.**

---

[123] *See* "Boeing, initially defensive, now 'humbled' by 737 crisis," *The Washington Post*, March 27, 2019, available at https://www.washingtonpost.com/business/2019/03/27/boeing-initially-defensive-now-humbled-by-max-crisis/?utm_term=.62d46e19c9d7.

[124] *Id.*

[125] *Id.*

From the days immediately following the Lion Air accident, we've had teams of our top engineers and technical experts working tireless in collaboration with the Federal Aviation Administration and our customers to finalize and **implement a software update** that will ensure accidents like that of Lion Air Flight 6110 and Ethiopian Airlines Flight 302 never happen again…

This update, along with the associated training and additional educational materials **that pilots want** in the wake of these accidents, will **eliminate the possibility of unintended MCAS activation** and prevent an MCAS-related accident from ever happening again.

*See* Boeing CEO Dennis Muilenburg Addresses the Ethiopian Airlines Flight 302 Preliminary Report, Press Release, https://boeing.mediaroom.com/2019-04-04-Boeing-CEO-Dennis-Muilenburg-Addresses-the-Ethiopian-Airlines-Flight-302-Preliminary-Report

192.    Boeing knew or should have known prior to the First Crash that by its actions or omissions the MAX was defective in design, had inadequate warnings, and was unreasonably dangerous in the following ways, among others:

a.    the subject aircraft's automated flight control system, which is new and unique to the 737 MAX series, causes the aircraft to dive down automatically towards the ground in situations where such dives are unwarranted, unreasonably dangerous, and erroneous;

b.    the subject aircraft's electrical and computer components erroneously and automatically force the nose of the airplane down, causing it to dive, even when the aircraft is being flown manually by pilots;

c.    the subject aircraft's flight control system incorrectly and automatically operates the aircraft in such a way as to cause excessive nose-down inputs and significant altitude loss;

d.    the subject aircraft's sensors are defective and generate false readings, including false readings related to the aircraft's angle of attack—the angle between the wing and the oncoming airflow—which triggers the aircraft's automated flight management and control systems to push the aircraft's nose downward;

e.    the subject aircraft's lack of redundancies in its sensors renders it unreasonably dangerous because minor inputs and minor errors can force the aircraft into an uncontrollable nosedive;

f.    the subject aircraft's safety alerts relating to angle-of-attack sensors were defective as known to Boeing;

51

g.  the subject aircraft's defective sensors and flight control system cause the aircraft's control yolk to feel different from the yolks used for training the users of the 737 series, which cause the subject aircraft's pilots to be confused and unable to correct the subject aircraft's automatic dive;

h.  Boeing failed to warn the FAA, airlines, pilots, users, and intended third-party beneficiaries of the defective automation that causes the subject aircraft to dive, of the defective sensors and safety alert system, and Boeing failed to warn and educate users on possible manual overrides to the subject aircraft's defective system; and

i.  Boeing failed to adequately test the subject aircraft, its flight control system, and its sensors, and Boeing failed to substantiate the changes to its previous 737 models with sufficient testing and data.

193.    During the Class Period, Boeing failed to warn the public, the airlines, the pilots, the users, and the intended third-party beneficiaries of the 737 MAX's unreasonably dangerous and defective design, including that the aircraft automatically and uncontrollably dives.

194.    According to an FAA briefing to legislators, Boeing will change the MCAS software to give the system input from both angel-of-attack sensors.

195.    It will also limit how much MCAS can move the horizontal tail in response to an erroneous signal.  And when activated, the system will kick in only for one cycle, rather than multiple times.

196.    In the aftermath of the crashes, officials at the pilot unions criticized Boeing for providing no information about MCAS, or its possible malfunction, in the 737 manuals.

197.    Captain Mike Michaelis, chairman of the safety committee for the Allied Pilots Association which represents American Airlines pilots, said, "It's pretty asinine for them to put a system on an airplane and not tell the pilots who are operating the airplane, especially when it

deals with flight controls. Why weren't they trained on it?"[126]

198.     In an interview with *The New York Times*, Dennis Tajer, a pilot and spokesperson for the Allied Pilots Association, explained, "An aircraft dipping after takeoff is not normal. It's beyond abnormal. It's unacceptable."[127]

199.     Southwest Airlines fleet includes 34 737 MAX jets.  On April 12, 2019, Jon Weeks, the President of the Southwest Airlines Pilots Union, criticized Boeing for failing to mention the MCAS in its pilot training or MAX manuals prior to the First Crash.  Weeks wrote, "Boeing will, and should, continue to face scrutiny for the ill-designed MCAS and initial nondisclosure of the new flight control logic."[128]

200.     Southwest Airlines and other carriers did not know about the lack of the warning system for more than a year, because Boeing did not inform airlines that it had turned off the feature known as the "AOA disagree alerts" that informed pilots whether the angle-of-attack sensor was transmitting errant data about the pitch of the plane's nose. Southwest and most other airlines operating 737 MAX jets learned about it only after the First Crash. [129]

––––––––––––––––––––––––––––––

[126]  "Boeing Withheld Information on 737 Model, According to Safety Experts and Others," *The Wall Street Journal*, November 13, 2018, available at https://www.wsj.com/articles/boeing-withheld-information-on-737-model-according-to-safety-experts-and-others-1542082575
[127] See https://www.nytimes.com/interactive/2018/12/26/world/asia/lion-air-crash-12-minutes.html.
[128] "737 Max Crisis Prompts Southwest pilots to question its all-Boeing fleet," *The Seattle Times*, April 12, 2019, available at https://www.seattletimes.com/business/boeing-aerospace/737-max-crisis-prompts-southwest-pilots-to-question-its-all-boeing-fleet/. *See also* "Boeing Max 8 Update," *SWAPA*, April 12, 2019, available at https://swaparesources.s3-us-west-2.amazonaws.com/assets/190412_LeadershipUpdate_Boeing_MAX_Update.pdf.
[129]  "Boeing's Enduring Puzzle," *The Wall Street Journal*, available at https://www.wsj.com/articles/boeings-enduring-puzzle-why-certain-safety-features-on-737-max-jets-were-turned-off-11556456400?mod=hp_lead_pos1; "Southwest: Boeing didn't say it had

201.    Weeks further stated, "Southwest's own manuals were wrong" about the availability of alerts, and that since Boeing has not communicated the modification to the carrier, the manuals reflected incorrect information.

202.    After the First Crash, Southwest Airlines opted to add a feature that shows the specific sensor measurements to its 737 MAX jets.[130]

203.    American Airlines was one of the few U.S. carriers that paid for the package of MAX safety features that included sensor warning lights.  The airline has said it did so in part to obtain the warning system.[131]

204.    In a meeting about a month after the First Crash, a Boeing executive appeared to acknowledge the importance of the sensor warnings.  The executive told American Airlines pilot union officials that American's MAX cockpit warnings lights would have helped them avoid problems like those encountered by the pilots in the First Crash.[132]

205.    An FAA safety engineer said the lack of prior information could have been crucial in the First Crash.

206.    After the grounding of the MAX jets Boeing has announced it plans to update pilot training requirements and flight manuals to include MCAS.

207.    The changes Boeing is proposing mirror the critique made by the safety

---

deactivated safety alert," *The Seattle Times*, available at
https://www.seattletimes.com/business/southwest-boeing-didnt-say-it-had-deactivated-safety-alert/?utm_source=email&utm_medium=email&utm_campaign=article_inset_1.1
[130] "Between Two Deadly Crashes, Boeing Moved Haltingly," *The Wall Street Journal*, April 2, 2019, available at https://www.wsj.com/articles/between-two-deadly-crashes-boeing-moved-haltingly-to-make-737-max-fixes-11554164171
[131] Boeing's Enduring Puzzle," *The Wall Street Journal*, available at
https://www.wsj.com/articles/boeings-enduring-puzzle-why-certain-safety-features-on-737-max-jets-were-turned-off-11556456400?mod=hp_lead_pos1
[132] *Id.*

engineers in *The Seattle Times* story made available to Boeing before the Second Crash.

**F.  Reputational Damage to Boeing Continued to Increase Through the Class Period**

208.    Defendants' failure to promptly disclose the truth about the 737 MAX jets caused the price of Boeing stock to be artificially inflated, and harmed Boeing's long-term prospects as an investment and undermined the creditability of those managing the company.

209.    Economic analysis further shows that "reputational harm is a common result of fraud and grows the longer the fraud is concealed, translating to larger stock drops." *Jander v. Retirement Plans Committee of IBM*, 910 F.3d 620, 629 (2nd Cir. 2018).  Plaintiffs need not allege fraud for their ERISA claims, however, but only that Defendants had knowledge of the overvaluation of the Boeing stock and failed to disclose the wrongfully concealed information, as alleged herein. *Id.* at 632.

**G.  Boeing Stock was Traded in an Efficient Market**

210.    Because Boeing stocks were traded in an efficient market, Defendants could not have reasonably believed that the disclosure that its 737 MAX jets were unsuitable for flight would have harmed Boeing stock prices more than the correction of the price after the disclosure. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (stating "the market price of shares traded on well-developed markets reflects all publicly available information."). Defendants could not have believed this because it would be contrary to most basic economic principles regarding efficient markets. Nor did Defendants have any reason to believe that any factors were distorting the market which would have affected Boeing's stock price any more than a correction for the inflated price.

**H.  Eventual Disclosure was Inevitable because of Boeing's Duty to Disclose the Problems with its 737 MAX**

211.    By no later than mid-January 2019, when Boeing learned definitively that the

MCAS problems with the 737 MAX had caused the First Crash when the cockpit voice recorder was recovered, it was inevitable that the truth about Boeing's 737 MAX would become known to the public and that the inflation in Boeing's stock caused by the concealment of those safety issues would leave, resulting in losses to shareholders who had purchased and/or held Boeing shares during the Class Period.

212.    Nevertheless, Boeing failed to disclose the truth.

213.    Despite their knowledge of Boeing's false representations regarding the safety of the 737 MAX jet, the inflation of Boeing's stock price, and the inevitability of the disclosure of the truth, Defendants have taken no action to disclose the truth to the public. Instead, Defendants have stayed quiet as the Plan's participants, including Plaintiffs, continue to purchase and hold Boeing's stock at the inflated price.

214.    Making a corrective disclosure once it became inevitable that the public would learn about the safety issues with the 737 MAX was an alternative action that the Defendants could have taken that would have been entirely consistent with the securities laws and which no prudent fiduciary could have viewed as more likely to harm the Plan than to help it.

215.    Nor are the corrective disclosures at issue here merely a matter of hindsight. It would have been obvious to any prudent and loyal fiduciary no later than January 2019 that corrective disclosure would have benefitted the Plan. As the Second Circuit has explained, "[a] reasonable business executive could plausibly foresee that the inevitable disclosure of longstanding corporate fraud would reflect badly on the company and undermine faith in its future pronouncements." *Jander*, 910 F.3d at 629.

216.    Many economists and financial analysts have concluded that corporate fraud has significant reputational consequences that translate into concrete economic harm. For example,

reputational penalties have been found to include "a loss of sales by a firm that engages in consumer fraud… and increases in the rate of return required by investors when a firm issues vague or misleading financial statements."[133] Moreover, studies have shown "a significant negative average abnormal stock price reaction (loss in firm value) when allegations of corporate misconduct are announced."[134] Indeed, the longer the fraudulent corporate conduct lasts, the greater the reputational harm will likely be.

217.    In Boeing's case, the reputational harm from the concealment of the safety issues with the 737 MAX has been real and dramatic. For example, *Bloomberg* reported that "Boeing also had a responsibility to err on the side of safety and an opportunity to control the story by advocating conservatism earlier. It chose not to, and it will have to wrestle with the reputational damage wrought by that decision."[135] In an article entitled "Boeing: An Unmitigated Reputational Damage," Marketscreener.com summarized that "Since the unfortunate incidence, the company has been more focused on managing its reputation which has sunk lower every day and continues to damage its brand equity. There are strong doubts on whether Boeing will regain

---

[133] Deborah L. Murphy, Ronald E. Shrieves & Samuel L. Tibbs, "Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk," *Journal of Financial and Quantitative Analysis*, Vol. 44, No. 1 (Feb. 2009).
[134] *Id. See also* Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis*, Vol. 43, No. 3 (Sept. 2008).
[135] "Sutherland, Boeing and the FAA Already Lost Control of the Narrative," *Bloomberg*, March 13, 2019, available at https://www.bloomberg.com/opinion/articles/2019-03-13/boeing-and-the-faa-737-max-grounding-damage-is-already.

its stellar reputation in the aviation sector."[136]

218.    On April 16, 2019, *The Wall Street Journal* reported that "[r]estoring trust in the popular MAX airplane w[ould] take time, industry officials predicted."[137] On May 14, 2019, the Boston Globe published an editorial opining that "[t]he unsafe aircraft deal a devastating blow to the reputation of Boeing, revealing the once-iconic American corporation as callous, careless, secretive, ill-governed, arrogant, and adverse to accountability."[138] On this news, the price of Boeing shares decline to $343.04 on May 14, 2019.

219.    On May 16, 2019, CNN described Boeing as "grappling with a profound crisis that threatens to undo the company's century old reputation for safety."[139] On May 24, 2019, it was reported that the SEC was "investigating whether Boeing Co. properly disclosed issues tied to the grounded 737 Max jetliner."[140] And, in a televised interview on CNBC on June 3, 2019, Boeing's CEO, Dennis Muilenburg, acknowledged that MCAS problems had "impacted the trust and confidence of the flying public [that Boeing] take[s] very, very seriously."[141]

---

[136] "Boeing : An Unmitigated Reputational Damage," Marketscreener.com, March 20, 2019, available at https://www.marketscreener.com/BOEING-COMPANY-THE-4816/news/Boeing-An-Unmitigated-Reputational-Damage-28197554/.

[137] "Boeing Looks to Fix Its Reputation, Along With the MAX; 'We'll do everything possible to earn and re-earn that trust and confidence from our airline customers,' CEO Says," *The Wall Street Journal* (Apr. 16, 2019)

[138] "After two crashes, Boeing needs new leadership – and big changes," *Boston Globe* (May 14, 2019)

[139] " Boeing has 'crisis of confidence.' It's time for the board to step up," CNN Wire Service (May 16, 2019)

[140] "Boeing Faces SEC Investigation Into Its 737 Max Disclosures," Bloomberg, May 24, 2019, available at https://www.bloomberg.com/news/articles/2019-05-24/boeing-faces-sec-probe-into-disclosures-about-737-max-troubles

[141] CNBC Transcript: Boeing Chairman & CEO Dennis Muilenburg speaks with CNBC's Phil Lebeau Today on CNBC's "The Exchange" (June 3, 2019), available at:

220.    Defendants knew of the overvaluation of Boeing stock during the Class Period but failed to disclose the overvaluation publicly, thereby injuring Plan participants who purchased units of the Boeing stock fund through their Plan accounts during the Class Period.

## DEFENDANTS' FIDUCIARY STATUS UNDER ERISA

221.    ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

222.    The Committees were named fiduciaries of the Plan during the Class Period, with general authority to carry out essentially all fiduciary functions for the Plan.

223.    Defendants were members of the Committees responsible for exercising their primary fiduciary authority in relation to the Plan.

224.    ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they in fact perform a fiduciary function. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

225.    As the Seventh Circuit has previously recognized, "ERISA … defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan

_____

https://www.cnbc.com/2019/06/03/cnbc-transcript-boeing-chairman-ceo-dennis-muilenburg-speaks-with-cnbcs-phil-lebeau-today-on-cnbcs-the-exchange.html. *See also,* "Boeing CEO Admits Mistake In 737 Max Communication," NPR, June 16, 2019, available at https://www.npr.org/2019/06/16/733215857/boeing-ceo-admits-mistake-in-737-max-communication ("Boeing Chief Executive Officer Dennis Muilenburg says the company should have been more transparent with regulators and the public when Boeing discovered a safety light was not operating as designed.")

… thus expanding the universe of persons subject to fiduciary duties[.]" *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 916 (7th Cir. 2013) (quoting *Mertens v. Hewitt Assocs.*, 113 S. Ct. 2063, 2071).

226.    Here, the Committee Members exercised control and authority over the Plan as members of the Committees.

227.    On or about December 27, 2007, the EBIC, Boeing and U.S. Trust Company N.A. entered into an agreement regarding the Boeing Stock Fund, thereby appointing U.S. Trust Company, N.A. as an independent fiduciary for the Plan with authority respect to the Boeing Stock Fund. On May 1, 2009, Evercore Trust Company, N.A. ("Evercore") succeeded to U.S. Trust Company's duties under that agreement.

228.    On August 9, 2017, Evercore, Boeing and the EBIC amended and restated the agreement by letter (the "August 2017 Letter Agreement").

229.    The August 2017 Letter Agreement recites that the EBIC "is a fiduciary with respect to the [Plan] that is charged with the authority and responsibility for the management and investment of the assets of the [Plan], including the assets of the Plan that consist of shares of common stock of [Boeing]."

230.    The August 2017 Letter Agreement also recites that the EBIC "has the authority under the Plan to appoint investment managers for the assets of the Plan and hereby appoints Evercore Trust as investment manager for the assets of the Plan that consist of [Boeing stock]."

231.    The August 2017 Letter Agreement provides that Evercore "will at all times have the exclusive fiduciary authority and responsibility, in its sole discretion, to determine whether the continuing investment in [Boeing Stock] is prudent under ERISA (either with respect to permitting new investments in [Boeing Stock], continuing to hold [Boeing Stock], or both).

Evercore shall, to the fullest extent permitted by ERISA, take into account, among other factors, the design of the Plan regarding [Boeing Stock], the availability of other investment options under the Plan, and the ability of Plan participants to construct a diversified portfolio of investments consistent with their individual desired level of risk and return."

232.    The August 2017 Letter Agreement further provides that "[i]n exercising its authority and responsibility … [Evercore] shall have the authority to exercise any and all of the following powers, and to instruct the trustee of the Plan accordingly:

(i) to suspend or prohibit the investment of new participant or employer contributions in [Boeing Stock];

(ii) to suspend or prohibit the transfer of participant account balances into [Boeing Stock];

(iii) in connection with the determination that holding [Boeing Stock] is no longer prudent under ERISA, to liquidate the [Boeing Stock] and sell or otherwise dispose of all [Boeing Stock] held in the Company Stock Fund;

(iv) to suspend or prohibit the transfer of participant account balances out of [Boeing Stock] during any period in which Evercore Trust is directing the sale or other disposition of the [Boeing Stock];

(v) to designate an alternative investment fund available under the Plan for the temporary investment of any proceeds from any sale or other disposition of [Boeing Stock] directed by Evercore Trust pursuant to (iii) above following the completion of such sale or other disposition, pending participant directions to the trustee of the Plan with respect to the investment of such proceeds;

(vi) to manage the liquidity needs of the Company Stock Fund; and

61

(vii) to provide upon request such information as is reasonably necessary for the [EBIC] to fulfill its reporting obligations with respect to the Plan, including with respect to Schedule C of Form 5500."

233.    However, the August 2017 Letter Agreement clarified that Evercore "will not have any authority or responsibility with respect to the Plan or [Boeing Stock] that is not expressly granted to it under this Agreement. Without limiting the generality of the foregoing, Evercore Trust will not have any authority or responsibility to (i) change the design of the Plan with respect to the Company Stock Fund or alter the purpose of the Company Stock Fund, (ii) establish any investment fund or investment option under the Plan, whether as an alternative to the Company Stock Fund or otherwise, (iii) provide investment advice or investment management services with respect to individual participant investment allocation to the Company Stock Fund or any other investment option under the Plan, (iv) vote shares of Company Stock or respond to tender offers for Company Stock, which authority and responsibility will be exercised in accordance with the terms of the Plan and the Trust, _**(v) prepare or submit any securities filings that state or federal regulatory agencies require the Trust to file, other than SEC Forms 13F and 130, or any successor filing, (to the extent such filings are required),**_ (vi) any matters relating to the trading of Company Stock by the Plan other than as specifically set forth in Sections 3 or 6 of this Agreement, or (vii) the valuation of the assets of the Company Stock Fund for reporting or filing purposes."

234.    The EBIC's retention of Evercore as an investment manager does not absolve Defendants of their liability for failure to make corrective disclosure regarding the inflation of the price of Boeing Stock at issue in this case, for a number of reasons.

235.    First and foremost, the duty to make corrective disclosure is non-delegable. A

fiduciary with information that plan participants are purchasing assets that the fiduciary knows to be overpriced and that information about the overpricing will inevitably be disclosed has a duty to act, and in this case the fiduciaries could have acted by making corrective public disclosure about matters material to the Company's financial results that were misstated or omitted, including information concerning defects affecting the 737 MAX, and saved plan participants considerable losses. The duty to take such action is not delegable, and ERISA § 410 would invalidate any attempt to immunize a fiduciary from a reduction in that liability. Even if a fiduciary did delegate that authority, they would retain an ongoing duty with respect to their appointees or delegatees to keep them informed and ensure that those fiduciaries made such a public disclosure.

236. Second, the delegation of authority to Evercore in this case on its face does not encompass any authority to make a corrective public disclosure about matters that are material to the Company's financial results that were misstated or omitted and caused the price of Boeing stock to be artificially inflated. In addition, the delegation to Evercore is limited to those powers expressly delegated.

237. Third, the delegation of authority to Evercore expressly withholds from Evercore authority to "prepare or submit any securities filings that state or federal regulatory agencies require the Trust to file…"

238. Thus the EBIC did not delegate away its fiduciary obligations to make the corrective public disclosures at issue in this case.

**ERISA'S FIDUCIARY DUTIES**

239. ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

240.    "As various courts have observed, the duties charged to an ERISA fiduciary are 'the highest known to law." *George v. Kraft Foods Global, Inc.*, 814 F.Supp.2d 832, 852 (N.D. Ill. 2011).

241.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence. They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

242.    According to the Department of Labor ("DOL") regulations and case law interpreting these statutory provisions, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action

involved, including the role the investment or investment course of action plays in that portion of

the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b)

he has acted accordingly.

243.     Even though a plan may be designed, or even required, to hold stock of the plan's

sponsor as an investment option, such as an employee stock ownership plan (an "ESOP"), plan

fiduciaries are nevertheless subject to all of the ordinary fiduciary duties apart from the duty to

diversify. As the Supreme Court explained, "because ESOP fiduciaries are ERISA fiduciaries

and because § 1104(a)(1)(B)'s duty of prudence applies to all ERISA fiduciaries, ESOP

fiduciaries are subject to the duty of prudence just as other ERISA fiduciaries are." *Fifth Third

Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014). The Supreme Court held that these

fiduciary duties trump even the instructions of the plan document: "the duty of prudence trumps

the instructions of a plan document, such as an instruction to invest exclusively in employer

stock even if financial goals demand the contrary." *Id.* at 2468.

244.     ERISA § 405 renders plan fiduciaries liable for the breaches of other fiduciaries

under certain circumstances, such as when a fiduciary knowingly participates in or conceals the

breach of another fiduciary, if the fiduciary's own breach enables the breach by the other

fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable

effort to correct the breach.

## CLASS ACTION ALLEGATIONS

245.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a), (b)(1) and (b)(3) on behalf of a Class consisting of all participants in or

beneficiaries of any defined contribution plan sponsored by Boeing, its subsidiaries or its

affiliates, who purchased or held Boeing stock (or units of Boeing stock funds) through their

retirement plan accounts during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the defendants have or had a controlling interest, and the Court or any employees of the Court. As used herein, the term "Class Period" means the time period beginning not later than on January 8, 2019, and continuing until May 14, 2019, inclusive.

246.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Boeing and the Plan's administrators.

247.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

248.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants had actual or constructive knowledge that Boeing stock price was artificially inflated during the Class Period;

- Whether Defendants had the authority to make corrective disclosure for Boeing concerning the unsuitability of 737 MAX;

- Whether Defendants' failure to make corrective disclosure regarding the unsuitability of 737 MAX once those facts became inevitable caused Plaintiffs and

the Plan to overpay for Boeing stock during the Class Period; and

- Whether Defendants' failure to make corrective disclosure regarding the unsuitability of 737 MAX once disclosure of those facts became inevitable caused additional declines to the value of Boeing stock held by Plaintiffs and the Plan as a result of the delayed disclosure.

249. There are no substantial individual questions among Class members on the merits of this action.

250. Plaintiffs' claims are typical of the members of the Class.

251. Plaintiffs have been injured by the alleged breaches of fiduciary duties and are committed to fairly, adequately, and vigorously representing and protecting the interests of Class members.

252. Plaintiffs have retained counsel who are experienced in class litigation in general and who have significant experience successfully representing ERISA plan participants in claims related to ERISA's fiduciary duties.

253. Neither Plaintiffs, nor their counsel, have any interests that would cause them to refrain from vigorously pursuing this action.

254. Plaintiffs are adequate class representatives.

255. Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

256. In the alternative, class certification is also appropriate under Fed. R. Civ. P.

23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class and because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### All Defendants

257.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

258.    ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

259.    As alleged above, the Committees and the Individual Defendants were express fiduciaries for the Plan.

260.    The Committees and Individual Defendants, as the Plan's fiduciaries, could, and should have acted to protect the Plan, including making corrective disclosure publicly admitting the artificially inflated stock price of Boeing stock.

261.    However, the Committees and Individual Defendants did not take action to protect the Plan. The Committees and Individual Defendants failed to make any corrective disclosure, and in the interim Plaintiffs and the Class members continued to acquire and hold Boeing stock at an inflated price.

262.    Boeing knew about, and encouraged, Individual Defendants' failure to make

appropriate corrective disclosures regarding its 737 MAX. Indeed, silence about Boeing's artificially inflated stock price was part of Boeing's corporate strategy. Thus, the Individual Defendants' failure to make corrective disclosures was taken within the course and scope of their duties as members of the Committees, and Boeing knowingly participated in the Individual Defendants' fiduciary breaches.

263.    These actions, and failures to act, violated the duties of prudence and loyalty contained in ERISA § 404(a).

264.    ERISA § 502(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409.

265.    Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

266.    Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

267.    Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**COUNT II**
**Breach of Co-Fiduciary Duty**
**ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)**
**All Defendants**

268.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

269.    A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

270.    Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendants are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

271.    ERISA § 502(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409.

272.    Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2) and (a)(3), must "make good" to the Plan the losses to the Plan resulting from its violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

273.    Thus, Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

274.    Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a);

B.    Declare that Defendants breached their fiduciary duties to the Plan;

C.    Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.    Order that Defendants make good to the Plan the losses resulting from their serial breaches of fiduciary duty;

E.    Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.    Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the Plan to the position they would have been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

G.    Award Plaintiffs' reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plan;

H.    Order Defendants to pay prejudgment interest; and

I.    Award such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  June 21, 2019

Respectfully submitted,

Diane Burke, Alex Proestakis, Miguel A. Ibarra and Mohammad Farooq Mustafa, as participants in and on behalf of the Boeing Voluntary Investment Plan, and on behalf of a class of all others who are similarly situated,

By: */s/ Michael M. Mulder*
Michael M. Mulder
Elena N. Liveris
THE LAW OFFICES OF
MICHAEL M. MULDER
1603 Orrington Avenue, Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Todd Schneider
James A. Bloom
Kyle G. Bates
Ryan M. Hecht
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Ste. 1400
Emeryville, California  94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com
rhecht@schneiderwallace.com
*Appearing pro hac vice*

Todd S. Collins
Eric Lechtzin
Ellen T. Noteware
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000
tcollins@bm.net
elechtzin@bm.net

enoteware@bm.net

*Attorneys for Diane Burke, Alex Proestakis,*
*Miguel A. Ibarra and Mohammad Farooq Mustafa*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2019, I electronically filed the forgoing document with the

Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing

to all CM/ECF participants. Robert E. Verbeck will be served via personal service.

DATED this 21 day of June, 2019

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP

By: <u>*/s/ James A. Bloom*</u>
    James A. Bloom (*Pro Hac Vice*)