IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIANE BURKE, ALEX PROESTAKIS, MIGUEL A. IBARRA, and MOHAMMAD FAROOQ MUSTAFA, as participants in and on behalf of the Boeing Voluntary Investment Plan, and on behalf of a class of all others who are similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE BOEING COMPANY, DAVID A. DOHNALEK, ROBERT E. VERBECK, THE BOEING EMPLOYEE BNEEFIT PLANS COMMITTEE, THE BOEING EMPLOYEE INVESTMEETN COMMITTEE, ANDJOHN DOES 1–25,<br><br>*Defendants.* | No. 19 C 2203<br><br>Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Diane Burke, Alex Proestakis, Miguel A. Ibarra, and Mohammad Farooq Mustafa (collectively, "Plaintiffs") bring this putative class action on behalf of themselves, on behalf of the Boeing Voluntary Investment Plan ("Plan"), and all other similarly-situated participants in, and beneficiaries of, defined contribution plans ("Plans") sponsored by The Boeing Company ("Boeing") who acquired or held securities of Boeing between November 7, 2018, and December 16, 2019 (the "Class Period"). Plaintiffs claim that Boeing, David A. Dohnalek, Robert E. Verbeck, the

Employee Benefit Plans Committee ("EBPC"), the Employee Benefit Investment Committee ("EBIC"), and Committee Members John Does 1–25 ("Committee Members") (collectively, "Defendants") breached their respective duties of prudence imposed by the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1104(a)(1)(B). Presently before the Court is Defendants' Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Fed. R. Civ. P. 12(b)(6). Defendants' motion is granted.

## BACKGROUND

The following factual allegations are taken from Plaintiffs' Second Amended Complaint (Dkt. 65) and are presumed true for the purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

### I. The Plan and The Defendants

Boeing designs, builds, and sells airplanes, including its flagship 737 MAX airplane. (Dkt. 65 ¶¶ 1, 40). Boeing offers its employees the opportunity to participate in the Plan, a defined contribution "employee pension benefit plan" and an "eligible individual account plan" that creates individual accounts into which participants may contribute a portion of their compensation. (Dkt. 65 ¶ 35). One of the investment options offered by the Plan is the VIP Stock Fund ("Stock Fund"), an employee stock ownership plan ("ESOP"), which invests in shares of Boeing stock. (Dkt. 65 ¶ 8). As of December 31, 2018, the Plan held $10.8 billion in Boeing stock, accounting for 18.6% of net Plan assets. (Dkt. 65 P¶ 4, 8).

The EBPC is the Plan Administrator under ERISA § 1002(16)(A) and comprises Boeing officers and employees. (Dkt. 65 ¶ 41). The EBIC is responsible for overseeing the Plan's investment options. (Dkt. 65 ¶ 42). During the Class Period, Dohnalek, Boeing Senior Vice President of Finance and Treasurer, served as Chairman of the EBIC. (Dkt. 65 ¶ 47). Verbeck, Boeing's Senior Vice President, Finance and Controller, was a member of the EBIC and also signed Boeing's SEC filings during the Class Period. (Dkt. 65 ¶ 48).

## II. The 737 MAX Airplane

In 2011, Boeing started modifying its 737 series to develop a new airplane, the 737 MAX. (Dkt. 65 ¶ 52). The angle of attack sensors on the 737 MAX, which measure the angle between a reference point on the airplane's wing and the oncoming airflow, occasionally gave false readings that the angle of attack was too high and the airplane was in danger of stalling out. (Dkt. 65 ¶¶ 59–66). Indications that the angle of attack is too high automatically trigger the Maneuvering Characteristics Augmentation System ("MCAS"), a software in the 737 MAX which pushed the nose of the plane down until the sensors indicated the angle of attack was appropriately reduced. (Dkt. 65 ¶¶ 60–64). Boeing did not disclose the existence of the MCAS to airlines and pilots, did not warn pilots that they were the back-up to the automated system, did not train pilots on the MCAS, and did not include instructions about the MCAS in the pilot manuals. (Dkt. 65 ¶ 78). Plaintiffs allege that Defendants "knew or should have known" about these safety issues. (Dkt. 81).

On October 29, 2018, Lion Air Flight 610 ("Lion Air"), operating a 737 MAX airplane, crashed into the Java Sea, killing all 188 passengers and crew. (Dkt. 65 ¶ 105). The Indonesian National Transportation Safety Committee ("NTSC") immediately opened an investigation into the Lion Air crash. (Dkt. 65 ¶ 12). The NTSC's initial report, published on November 7, 2018, and based on the black box recovered from Lion Air, indicated that a faulty angle of attack sensor triggered the MCAS repeatedly throughout the flight, pushing the nose of the airplane down until it crashed. (Dkt. 65 ¶¶ 106, 111). In January 2019, the Lion Air airplane cockpit voice recorders were recovered, "a crucial development in determining exactly what went wrong." (Dkt. 65 ¶ 140). The cockpit voice recorders confirmed that the pilots were struggling with the MCAS system. (Dkt. 65 ¶ 140). In the wake of the Lion Air crash, Boeing defended the 737 MAX's safety features and resisted calls to alter its systems or pilot training. (Dkt. 65 ¶¶ 123, 125, 128, 130–32). On November 6, 2018, Boeing issued a statement to all 737 MAX operators cautioning them that a sensor failure could cause the airplane's nose to pitch down and the flight crew might have enough difficulty controlling the airplane to result in a crash. (Dkt. 65 ¶¶ 118–19).

On March 10, 2019, Ethiopian Flight 302 ("Ethiopian Flight"), operating a 737 MAX airplane, crashed six minutes after takeoff, killing all 157 passengers and crew aboard. (Dkt. 65 ¶¶ 160, 163). The angle of attack sensor recorded an erroneous value and triggered the MCAS, forcing the nose of the airplane down. (Dkt. 65 ¶¶ 160–61). Similar to the Lion Air crash, Ethiopian officials quickly opened an investigation into the Ethiopian Flight crash, the preliminary results of which

pointed to the MCAS. (Dkt. 65 ¶ 167–68). The Ethiopian Civil Aviation Authority published a follow-up Interim Investigation Report on March 9, 2020, which confirmed that the crash was attributable to issues with the MCAS. (Dkt. 65 ¶¶ 171–72).

At this point, a slew of American entities opened investigations into the 737 MAX as well. On March 17, 2019, *The Seattle Times* released an investigative report on the 737 MAX safety and the MCAS. (Dkt. 65 ¶ 164). On March 18, 2019, U.S. federal authorities began exploring a criminal investigation into the certification process of the 737 MAX. (Dkt. 65 ¶ 165). The U.S. Transportation Department also opened an investigation into the MCAS approval process related to the 737 MAX certification. (Dkt. 65 ¶ 170). The House of Representatives, the Senate, and the Securities and Exchange Commission all opened investigations into various aspects of the 737 MAX's safety as well. (Dkt. 65 ¶ 191). Finally, in the wake of the Ethiopian Flight crash, the FAA—along with almost every country in the world—grounded the entire 737 MAX fleet. (Dkt. 65 ¶ 173–74). Boeing resisted the grounding of the 737 MAX fleet and questioned the role of the MCAS in the recent crashes. (Dkt. 65 ¶ 177–80, 183). By January 2020, Boeing halted production of 737 MAX airplanes. (Dkt. 65 ¶ 188).

Plaintiffs filed their initial complaint on March 31, 2019. (Dkt. 1). The operative Second Amended Complaint alleges three causes of action: (1) breach of fiduciary duty of prudence under ERISA § 404(a)(1) ("Count I"); (2) failure to monitor investments under ERISA § 404(a)(1) ("Count II"); and (3) breach of co-fiduciary duty

under ERISA §§ 404(a)(1)–(3) ("Count III"). (Dkt. 65 ¶¶ 262–92). Defendants move to dismiss the Second Amended Complaint on three primary grounds: (1) that none of the Defendants were fiduciaries of the Stock Fund; (2) that Plaintiffs' fail to satisfy the *Dudenhoeffer* pleading standard; and (3) that Count II and Count III fail as a matter of law. (Dkt. 71 at 8–10).

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Court accepts the complaint's factual allegations as true and draws all permissible inferences in Plaintiff's favor. *Schumacher*, 844 F.3d at 675 (quoting *Iqbal*, 556 U.S. at 678). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Olson v. Champaign Cty.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Seventh Circuit interprets this plausibility standard to mean that the plaintiff must "give enough details about the subject-matter of the case to present a story that holds together." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). Evaluating whether a plaintiff's claim is sufficiently plausible to survive a motion to dismiss is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Schumacher*, 844 F.3d 676 (quoting *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011); *Iqbal*, 556 U.S. at 678)). In the context of ERISA litigation, a Rule 12(b)(6) motion to dismiss is an important mechanism for weeding out meritless claims. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S 409, 425 (2014).

## DISCUSSION

### I. The Stock Fund's Fiduciary

As an initial matter, the Court must determine whether the Defendants had fiduciary responsibility over the Stock Fund. *See Pegram v. Hedrich*, 530 U.S. 211, 226 (2000) (explaining that in "every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."). A person is an ERISA fiduciary:

> [T]o the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. 1002(21)(A). Thus, under ERISA, fiduciaries are defined "in functional terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 509 U.S. 248, 251 (1993). The pertinent question is which, if any, of the Defendants was "acting as a fiduciary" with respect to the Stock Fund. In addition to the Second Amended Complaint, the Court may take judicial notice of documents expressly

referred to or relied upon by Plaintiffs, including the plan documents (Dkt. 71-3), the summary plan document ("SDP") (Dkt. 71-4), the 2017 Master Trust Agreement (Dkt. 71-6), and the Independent Fiduciary Agreement (Dkt. 71-6). *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).

As the Plan Administrator under ERISA § 3(16), the EBPC had no fiduciary responsibility over the Stock Fund. (Dkt. 65 ¶ 41). The EBPC's responsibilities are limited to "all matters related to administration of the Plan." (Dkt. 71-3 § 14.2(a)). This entails "full discretionary authority to interpret the Plan," determine questions relating to the Plan (including questions of participation eligibility and benefits entitlement) establish rules and procedures required to administer the Plan, maintain accounts, and generate annual reports. (Dkt. 71-3 § 14.2(a)–(d)). The EBPC is also responsible for "provid(ing) information to Members regarding the Investment Funds available under the Plan, including a description of the investment objectives and types of investments of each such Investment Fund." (Dkt. 71-3 § 5.1(b)). The EBPC is not responsible for, and Plaintiffs have identified no evidence to the contrary, investment decisions related to the Stock Fund.

The fiduciary status of the remaining defendants is not quite so straightforward. On August 9, 2017, before the Class Period, Boeing, the EBIC, and Evercore Trust Company, N.A. ("Newport")[1] entered into an amended and restated agreement ("Independent Fiduciary Agreement") relating to fiduciary responsibility over the Stock Fund. (Dkt. 71-7). The EBIC is the fiduciary "charged with the

---

[1] Evercore Trust Company, N.A. subsequently sold its institutional trust business to Newport Trust Company. For the sake of simplicity, this opinion will refer to "Newport."

authority and responsibility for the management and investment of . . . assets of the Plan that consist of shares of common stock of [Boeing]." (Dkt. 71-7 ¶ 1). The EBIC has the authority "to appoint investment managers for the assets of the Plan" and appointed Newport "as investment manager for the assets of the Plan that consist of [Boeing stock]." (Dkt. 71-7 ¶ 1).

The EBIC's delegation assigned Newport "exclusive fiduciary authority and responsibility, in its sole discretion, to determine whether the continuing investment in the [Stock Fund] is prudent under ERISA." (Dkt. 71-7 ¶ 3). As the fiduciary responsible for the Stock Fund, Newport was obligated to "communicate with Plan participants concerning their investment in the [Stock Fund] at such times as [Newport] reasonably determine[d] to be necessary under ERISA or desirable in the discharge of [Newport's] duties and responsibilities under [the Independent Fiduciary Agreement]." (Dkt. 71-7 ¶ 8).

The Independent Fiduciary Agreement provides that Boeing "shall retain the responsibility ***in its corporate capacity*** to comply with the requirements of applicable securities laws and ERISA with respect to the offering of [Boeing stock] under the plan." (Dkt. 71-7 ¶ 8) (emphasis added). The plain language of this provision describes Boeing's corporate role, not a fiduciary role, with respect to the Stock Fund.

Newport, then—not Boeing, not the EBIC, and not Dohnaek, Verbeck, or Does 1–25—had fiduciary responsibility over the Stock Fund. This alone is sufficient to dispose of Plaintiffs' claims against Defendants.

## II.      Count I: Duty of Prudence

Even assuming Defendants had fiduciary responsibility for the Stock Fund and possessed material inside information about the 737 MAX, the Second Amended Complaint still does not survive Defendants' Rule 12(b)(6) challenge. ERISA requires fiduciaries to manage plan assets "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use" under the circumstances. 29 U.S.C. §1104(a)(1)(B). ESOP fiduciaries confront a unique conflict between securities laws and their duty of prudence when alleged to have inside information that a stock is overpriced. *Dudenhoeffer*, 573 U.S. at 423; *see also Amgen Inc. v. Harris*, 136 S. Ct. 758, 759 (2016). The Supreme Court established a demanding pleading standard for imprudence claims based on allegations an ESOP fiduciary possessed inside information:

> "To state a claim for the breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it."

*Dudenhoeffer*, 573 U.S. at 428.

Three considerations "inform the requisite analysis." *Id*. First, the court must bear in mind that ERISA does not require a fiduciary to break the law, including the securities laws. *Id*. at 428–29. Second, "where a complaint faults fiduciaries . . . for failing to disclose that information to the public so that the stock would no longer be overvalued . . . [t]he courts should consider the extent to which an ERISA-based obligation . . . to disclose inside information to the public could conflict with the

Page 10 of 15

complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws." *Id.* at 429. Third, the court "should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that . . . publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Dudenhoeffer*, 573 U.S. at 429–30. The *Dudenhoeffer* standard places a significant pleading burden on Plaintiffs. *See, e.g., Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016).

Plaintiffs allege that, as of November 7, 2018, Defendants possessed nonpublic information regarding problems with the MCAS and attendant "severe safety issues" that rendered the 737 MAX airplanes unsafe to fly. (Dkt. 65 ¶¶ 16, 24). At this point, Plaintiffs claim that Defendants knew or should have known that such information would inevitably become public. (Dkt. 65 ¶¶ 18, 216, 221). According to Plaintiffs, Defendants should have issued a corrective, public disclosure regarding the safety of the 737 MAX airplanes. (Dkt. 65 ¶ 24). Plaintiffs assert that, because Boeing stock is traded on an efficient market, such disclosure would not cause an outsized correction in the stock price. (Dkt. 65 ¶¶ 26, 215). Plaintiffs also cite general economic principles holding that "reputational harm is a common result of fraud and grows the longer the fraud is concealed, translating to larger stock drops." (Dkt. 65 ¶ 214). Therefore, Plaintiffs allege that "[n]o prudent fiduciary in Defendants' positions could have concluded that earlier disclosures . . . would have done more

harm than good to Plaintiffs" and the Class' retirement savings." (Dkt. 65 ¶ 21). Defendants' failure to issue a corrective disclosure resulted in unnecessary reputational harm which further depressed Boeing's share price and allowed Plaintiffs, the Plans, and other Plan participants who included Boeing shares in their retirement savings to purchase the stock at an inflated price. (Dkt. 65 ¶¶ 3, 30).

Plaintiffs' allegations fail to meet the *Dudenhoeffer* standard. Specifically, Plaintiffs have not adequately pled that a prudent fiduciary could not conclude that public disclosure would do more harm than good to the Plan. *See Amgen*, 136 S. Ct. at 760 ("[T]he facts and allegations supporting that proposition should appear in the [] complaint."). Although the Seventh Circuit has yet to reach the issue, the overwhelming majority of circuit courts to consider an imprudence claim based on inside information post-*Dudenhoeffer* rejected the argument that public disclosure of negative information is a plausible alternative. *See Dormani v. Target Corp.*, 970 F.3d 910, 915 (8th Cir. 2020); *Allen v. Wells Fargo & Co.*, 967 F.3d 767, 773–75 (8th Cir. 2020); *Martone v. Robb*, 902 F.3d 519, 526 (5th Cir. 2018); *Singh v. RadioShack Corp.*, 882 F.3d 137, 148–49 (5th Cir. 2018); *Graham v. Fearon*, 721 Fed. Appx. 429, 435–36 (6th Cir. 2018); *Laffen v. Hewlett-Packard Co.*, 721 Fed. Appx. 642, 644 (9th Cir. 2018); *Saumer v. Cliffs Natural Resources Inc.*, 853 F.3d 855, 864–65 (6th Cir. 2017); *Whitley*, 838 F.3d at 529; *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016); *Lopeza v. John Does 1–10*, 659 Fed. Appx. 44, 45–46 (2d Cir. 2016).[2]

---

[2] The Second Circuit's decision in *Jander v. Retirement Plans Committee of IBM* appears to be the sole outlier. 910 F.3d 620 (2d Cir. 2018), *vacated and remanded sub nom. Retirement Plans Committee of IBM v. Jander*, 140 S. Ct. 592 (2020); *judgment reinstated* 962 F.3d 85 (2d Cir. 2020) (reinstating the judgment "pursuant to our initial opinion"); *petition for certiorari pending* (U.S. Sep. 4, 2020) (No. 20-

First, Plaintiffs admit that, during the Class Period, the 737 MAX's safety was the subject of ongoing, fast-paced, and highly publicized investigations. (Dkt. 65 ¶¶ 16 (November 7, 2018, release of Lion Air black box), 140 (describing the January 2019 recovery of the cockpit voice recorders for the Lion Air flight as "a crucial development in determining exactly what went wrong"). In this context, it is entirely plausible that a prudent fiduciary would deem public disclosure as likely to harm more than it helped. *See, e.g., Allen v. Wells Fargo & Co.*, 967 F.3d 767, 774–75 (8th Cir. 2020) ("We find that a prudent fiduciary . . . could readily conclude that it would do more harm than good to disclose information . . . prior to the conclusion of the government's investigation."); *Laffen*, 721 Fed. Appx. at 644 ("[A] prudent fiduciary in the same circumstances . . . could view [public disclosure] as likely to cause more harm than good without first conducting a proper investigation."). Second, even accepting Boeing stock is traded in an efficient market, public disclosure might have entailed releasing incomplete or inaccurate information which could have spooked the market and resulted in an outsized drop in the value of Boeing stock. This could have harmed both those Plan participants holding Boeing stock and those planning to sell their Boeing stock during the Class Period. *See Dudenhoeffer*, 573 U.S. at 429–30 (instructing courts to consider whether "publicly disclosing negative information . . . [could] caus[e] a drop in the stock price and a concomitant drop in the value of the stock already held by the fund"). Third, Plaintiffs' pleading regarding the harm of

---

289). In addition to being non-binding, and as explained more fully elsewhere in this opinion, the Second Circuit's receptiveness to general economic principles as support for reputational harm is neither the best application of the *Dudenhoeffer* pleading standard nor the generally accepted approach.

delayed disclosure is limited to an appeal to general economic principles that "reputational harm is a common result of fraud and grows the longer the fraud is concealed, translating to larger stock drops" (Dkt. 65 ¶¶ 213–14) is too generic to satisfy the requisite pleading standard. *See, e.g., Dormani*, 970 F.3d at 915; *Allen v. Wells Fargo & Co.*, 967 F.3d 767, 774 (8th Cir. 2020); *Martone*, 902 F3d at 526; *Graham*, 721 Fed. Appx. at 436; *Loeza v. John Does 1–10*, 659 Fed. Appx. 44, 46 (2d Cir. 2016). Although public disclosure *might* have ameliorated some harm to the Plan, Plaintiffs have not adequately alleged that course of action was so clearly beneficial that a prudent fiduciary could not conclude it would be more likely to harm the Plan than to help it.

### III. Count II: Failure to Monitor

In Count II, Plaintiffs allege Defendants breached their fiduciary duty of prudence by "failing to monitor investments," specifically, "the Plan's investment in Boeing company stock and take action to avoid losses to participants upon Defendants' knowledge of the imprudence of this stock during the Class Period." (Dkt. 65 ¶ 277). *Dudenhoeffer* establishes the pleading standard for allegations of fiduciary prudential breach with respect to publicly traded stock. *Dudenhoeffer*, 573 U.S. at 426–30. As Plaintiffs' claim involves nonpublic information, Plaintiffs bear the burden of pleading Defendants could have taken an alternative action, consistent with the securities laws, that a prudent fiduciary in similar circumstances could not have concluded would be more harmful than not. *Id*. at 428–30. For the reasons set forth above, the Second Amended Complaint does not satisfy the *Dudenhoeffer*

pleading standard. Count II is dismissed. *See, e.g., Catalfamo v. Sears Holding Corp.*, No. 17-cv-5230, 2018 WL 10560956, at *3–4 (N.D. Ill. Aug. 21, 2018) (rejecting a failure to monitor claim based on public information regarding a publicly traded stock for not meeting the *Dudenhoeffer* standard).

### IV.  Count III: Co-Fiduciary Duty

Plaintiffs' cause of action for breach of co-fiduciary duty under ERISA §§ 405(a)(1)–(3) is derivative of the underlying fiduciary breach alleged in Counts I and II. As Counts I and II fail, so must Count III. *See Pugh v. Tribune Co.*, 521 F.3d 686, 702 (7th Cir. 2008) (affirming dismissal of co-fiduciary liability based on rejected claims of fiduciary breach).

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Second Amended Complaint (Dkt. 70) is granted without prejudice. Plaintiffs may file an amended complaint consistent with this order within 21 days of the date of entry if they are able to do so.

_____
Virginia M. Kendall
United States District Judge

Date: November 12, 2020